543 A.2d 491

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert LARK, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1988.

Decided May 20, 1988.

Peter F. Rogers, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Alan Sacks, Robert A. Graci, Philadelphia, Chief Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On June 28, 1985, a jury of the Court of Common Pleas of Philadelphia County found appellant, Robert (a/k/a "Sugar Bear") Lark, guilty of murder of the first degree for the shooting death of Mr. Tae Bong Cho, possession of an instrument of crime, terroristic threats and kidnapping.

The following day, that same jury sentenced appellant to death after a hearing conducted pursuant to the Sentencing Code, 42 Pa.C.S.A. § 9711. Post trial motions were denied by the Honorable John A. Geisz, the presiding judge at trial, and on April 24, 1986, appellant was formally sentenced to death and to various terms of imprisonment on the other convictions. This direct appeal automatically followed. 42 Pa.C.S.A. § 9711(h)(1); 42 Pa.C.S.A. § 722(4); Pa.R.A.P. Rule 702(b).

The evidence introduced at trial, viewed in the light most favorable to the Commonwealth as the verdict winner, discloses the following complicated and unique sequence of events.

The three separate criminal incidents for which appellant was tried all shared a common denominator, the robbery of Mr. Tae Bong Cho of over $4,000.00 cash near his home in North Philadelphia on December 28, 1978. The robbery was accomplished by appellant placing a gun (which resembled a .45 caliber pistol but turned out to be a replica pellet gun) against the head of Mr. Cho's baby son and demanding his money. After taking the money, a check and other items, appellant fled in a red Cadillac.

Responding to a police radio broadcast, appellant was apprehended in a red Cadillac within minutes of this robbery in the possession of $4,255.00 in currency, a "BB repeater pistol," a change purse with the names of Mr. Cho and Sue Cho, and other items. Appellant was taken to the Northwest Detectives police station where he encountered Mr. Cho, in the process of rendering a police report, who immediately identified appellant as the man who took his money. Appellant was then charged with the robbery of Tae Bong Cho.

On February 22, 1979, Tae Bong Cho was assassinated while working behind the counter of his take-out food store at 3706 North Broad Street in North Philadelphia by one shot to his head at close range. The assassin wore a ski mask or stocking over his head, but several of the witnesses present in the store described his height, weight and cloth-

ing, and stated that he had placed a gun in the back waistband of his pants as he exited the store. Mr. Cho was scheduled to appear the next day, February 23, 1979, as the principal witness for the Commonwealth at appellant's preliminary hearing on the robbery charges.

Prior to the shooting of Tae Bong Cho, Commonwealth witness James Spencer spoke with appellant who was out on bail, and asked him what he was going to do about the robbery charges; appellant replied "he was going to take care of him ... he was going to kill him before he went to court so he wouldn't be able to testify against him." Notes of Testimony (N.T.) Trial June 21, 1985 at 110 (testimony of James Spencer on recall, redirect examination.[1]) Appellant also, on numerous occasions from the day following the shooting until shortly before his arrest in January, 1980, bragged to several persons about killing "the Korean." For example, appellant bragged to Commonwealth witness Benjamin Smith that he killed "the Korean" because he was a witness against him and said "from now on when there's witnesses in a case against him, he's going to kill him." N.T. Trial, June 13, 1985 at 15; see also: N.T. Trial June 17, 1985 at 10 (transcribed statement of Nathaniel Smith, deceased at time of trial); N.T. Trial June 21, 1985 at 110–11 (testimony of James Spencer); N.T. Trial, June 14, 1985 at 100–01 (out-of-court declaration of Michael Johnson that appellant suspected him of stealing jewelry from appellant's girlfriend and told Mr. Johnson he "had better get his stuff

1. In October, 1984, this witness, James Spencer, gave a statement to police detectives containing this threat by appellant to kill Tae Bong Cho, and appellant's admission after the murder that appellant had killed him. Initially, however, when called to the stand, Mr. Spencer recanted these statements he had attributed to appellant, claiming that he had fabricated them from information he had read in newspapers. N.T. Trial, June 14, 1985 at 128–29. Upon being recalled to the stand a week later, appellant reaffirmed his out-of-court statements of October, 1984 and explained his in-court recantation as resulting from threats made by appellant to him in the holding area where prisoners await transportation to court. Mr. Spencer said that appellant had threatened him and his family at that time if he would testify against appellant.

back to him or he would take care of [Johnson] like he had done the Korean on Broad and Erie about six months ago.")

The prosecution against appellant on the robbery charges continued despite the murder of the Commonwealth's principle witness. Assistant District Attorney Charles Cunningham was specially appointed to handle the prosecution, and after several continuances, a preliminary hearing was held on June 13, 1979. In the hallway outside the court room prior to the hearing, appellant approached Mr. Cunningham in a manner described as "shadow boxing" until he was directly across the hallway from Mr. Cunningham where he stood looking at Cunningham, pounding his fist into his other palm about fifteen or twenty times. The preliminary hearing was then held, after which the court held the case for trial. At this point, appellant turned his back to his lawyer, leaned toward Mr. Cunningham and said two or three unintelligible words and "you m_____ f_____." to Cunningham.

About one week later, a jury trial commenced on the robbery charges. At the conclusion of the Commonwealth's case, Mr. Cunningham rested, and a recess was called for lunch break. When proceedings resumed, appellant did not return and could not be located until his arrest on January 9, 1980. Trial continued in appellant's absence, and he was found guilty of robbery. While a fugitive from justice, appellant continued his pattern of threats and intimidation. On November 26, 1979, Mr. Cunningham, who was coordinating the investigation of the Cho murder and the search for appellant, received a telephone call from a man identifying himself as Robert Lark, who said he wanted to congratulate the prosecutor on a job well done, and that "You're a real aggressive guy and so am I and I want you to know that I will not let bygones be bygones." N.T. Trial, June 19, 1985 at 108. He also stated "I'm not going to let them take me." *Id.* After this telephone call, Mr. Cunningham and his family received around-the-clock police protection.

On November 27, 1979, appellant happened to run into Harry Tomlin, a recently retired City of Philadelphia police

officer who knew appellant. Officer Tomlin stated that he saw appellant at a Wendy's restaurant where appellant told him he had called Mr. Cunningham and he was "going to get him." Appellant then opened up his coat to show Mr. Tomlin a .45 caliber gun in a shoulder holster.

On December 27, 1979, Detective Frank Miller took a telephone call from a caller identifying himself as "Sugar Bear" (which is appellant's nickname). This caller asked for two detectives who were assigned to locate appellant, and he told Detective Miller that the detectives had better "watch their behinds" because he knew their cars and was following them and he had a "big surprise" for them. N.T. Trial, June 21, 1985 at 89.

Finally, on January 9, 1980, at about 2:10 p.m., Officer Barry Wilson spotted appellant in a yellow Cadillac and began to follow him. A highspeed chase ensued, and Officer Wilson lost visual contact with appellant, but he located the Cadillac parked in a parking lot. The officer then saw appellant running away, carrying a shotgun and a blue bag. Appellant broke into the home of Ms. Sheila Morris at 1327 North McFerran Street where he took Ms. Morris and her two children hostage. Appellant was also carrying a handgun in a holster.

Police Inspector William McDonough was in charge of the hostage situation, and communicated with a male in the house who said, inter alia: "This is Lark. ... I'll kill you all like that chinkee m_____ f_____ ... I'll shoot you in the legs. ..." N.T. Trial, June 20, 1985 at 61–62, and 73. Appellant called his lawyer who spoke with him and, after some consultation, appellant left the house and surrendered after his lawyer arrived. Neither Ms. Morris nor her two children had been harmed during their ordeal which lasted approximately two hours.

In the blue bag in appellant's possession were certain papers, including a telephone and address book with the notation "Cunningham 333–0988, 3201 Magee Avenue". Assistant District Attorney Cunningham's residence telephone number was unlisted; the address, 3201 Magee Ave-

nue, was Cunningham's parent's address and the number 333–0988 was Cunningham's grandfather's telephone number listed in the directory at that address.

Mr. Cunningham had one more encounter with appellant. At appellant's sentencing hearing on an unrelated robbery conviction in July, 1980, at which Mr. Cunningham was present, appellant formed his hand like a gun, pointed at Cunningham as if firing a gun, and said "point blank" to him.

Following his arrest on January 9, 1980, appellant was charged with numerous offenses stemming from three separate and distinct criminal episodes, including: the murder of Tae Bong Cho on February 22, 1979; terroristic threats against Assistant District Attorney Charles Cunningham on November 27, 1979; and kidnapping of Sheila Morris and her two children who were under fourteen years of age on January 9, 1980.

Appellant's first trial on these charges commenced on February 18, 1981 before the Honorable Theordore B. Smith, Jr., and ended in a mistrial on March 4, 1981. In November, 1981, appellant filed a motion for dismissal of charges on grounds of double jeopardy. This motion was denied by Judge Smith on March 30, 1982, which was affirmed by our Superior Court on June 15, 1984, and the case was remanded and reassigned to the Honorable John A. Geisz.

On March 21, 1985, appellant filed a motion to sever the three separate offenses for separate trials, which motion was denied just prior to commencement of appellant's second trial on June 10, 1985. On June 28, 1985, the jury returned verdicts of guilty of murder of the first degree[2] and possession of an instrument of crime-gun[3] (Bills No. 2013 and 2015), guilty of kidnapping of two children under fourteen years of age and of kidnapping Sheila Morris and holding them hostage[4] (Bills 2012 and 2022) and terroristic

2. 18 Pa.C.S.A. § 2502(a).

3. 18 Pa.C.S.A. § 907.

4. 18 Pa.C.S.A. § 2901.

threats against Charles Cunningham.[5]  The following day, a separate sentencing proceeding was conducted for the purpose of determining the appropriate sentence for the conviction of murder of the first degree, life imprisonment or death.  42 Pa.C.S.A. § 9711.  The jury found one aggravating circumstance beyond a reasonable doubt, namely that the victim was a prosecution witness to a murder or other felony committed by the appellant and was killed for the purpose of preventing his testimony against the appellant in criminal proceedings involving such offenses.  42 Pa.C.S.A. § 9711(d)(5).  Finding no mitigating circumstances, the jury returned a sentence of death as required where there are one or more aggravating circumstances and no mitigating. 42 Pa.C.S.A. § 9711(c)(1)(iv) (second proviso).  Post-verdict motions were denied by the court and, on April 24, 1986, appellant was formally sentenced.[6]  This appeal followed.

Our standard of review in cases of murder of the first degree in which a verdict of death has been rendered is established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

---

5.  18 Pa.C.S.A. § 2706.

6.  The sentences were:  Bill No. 2013—death;  Bill No. 2015—two and one-half to five years imprisonment concurrent to sentence on Bill No. 2013;  Bill No. 2012—ten to twenty years imprisonment, consecutive to sentence on Bill No. 2013;  Bill No. 2022—ten to twenty years imprisonment consecutive to sentences on Bills No. 2012, 2013 and 2015;  Bill No. 2021—three and one-half to seven years imprisonment consecutive to sentence on Bill No. 2013.

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Applying that standard, we now affirm appellant's convictions, his sentence of death and his sentences on the nonhomicide convictions.

Initially, we hold that the evidence was clearly sufficient, beyond a reasonable doubt, to sustain the jury's determination that appellant was guilty of murder of the first degree. Although appellant does not challenge the sufficiency of the evidence of murder of the first degree (or any of the other convictions for that matter), this Court will, as in all appeals from a judgment of sentence of death, review the record to determine whether the evidence is sufficient to sustain the conviction for murder of the first degree. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

■ Appellant first argues that the lower court abused its discretion, and deprived him of a fair trial, in denying his application for severance of the three separate and distinct offenses which were consolidated by the Commonwealth in a single indictment for prosecution in a single trial. This application alleged that there was an insufficient nexus between these crimes which were not of a similar character and had not arisen from a single criminal transaction, and that he would be unduly prejudiced by consolidation of these offenses at trial. The nature of the prejudice, as characterized in this application, was that: appellant "may become embarrassed or confused in his defense;" the "jury may use the evidence of one or more crimes charged to infer a criminal disposition on the part of" appellant; and that the "jury may cumulate evidence of the various crimes charged and find guilt, when, if considered separately, it would not so find." We hold that the lower court did not

abuse its discretion in denying appellant's application for severance.

The Pennsylvania Rules of Criminal Procedure set forth the procedures and standards governing consolidation and severance of offenses. Pa.R.Crim.P. Rule 219, Joinder of Offenses and Defendants In Indictments, provides in relevant part: "(a) Two or more offenses, of any grade may be charged in the same indictment if (1) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (2) the offenses charged are based on the same act or transaction."

Similarly, Pa.R.Crim.P. Rule 1127, Joinder—Trial of Separate Indictments or Informations, provides in relevant part: "A. Standards (1) Offenses charged in separate indictments or informations may be tried together if: (a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (b) the offenses charged are based on the same act or transaction."

Pa.R.Crim.P. Rule 1128, Severance of Offenses or Defendants, provides: "The court *may order separate trials* of offenses or defendants or provide other appropriate relief, *if it appears that any party may be prejudiced by offenses* or defendants *being tried together*." (emphasis added).

■ Rule 219 was amended and Rules 1127–28 were initially adopted on December 11, 1981, in order to conform to this Court's decision in *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981) (*see* comment to Pa.R.Crim.P. Rule 1127) which first enunciated the above standards after weighing the conflicting interests of the defendant (who wishes to avoid the possibility of prejudice and injustice caused by consolidation of offenses) and of the Commonwealth and her citizens (judicial economy and legitimate evidentiary considerations). In *Morris*, we held that the propriety of joinder of offenses, consolidation of separate indictments and severance of offenses for separate trials

were matters addressed to the sound discretion of the trial court and that the exercise of discretion by the trial court would only be reversed on appeal for manifest abuse of discretion or prejudice and clear injustice to the defendant. *Id.*, 493 Pa. at 170–71, 425 A.2d at 718. *See also Commonwealth v. Galloway*, 495 Pa. 535, 539, 434 A.2d 1220 (1981); *Commonwealth v. Morales*, 508 Pa. 51, 61, 494 A.2d 367, 372 (1985). Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: whether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses. The trial court gave due consideration to each of these inquiries and refused to grant appellant's application for severance of the three distinct offenses that had been consolidated in a single indictment by the Commonwealth. This Court must affirm that determination in the absence of manifest abuse of discretion or prejudice and clear injustice to appellant.

█ Evidence of distinct crimes are not admissible against a defendant being prosecuted for another crime *solely* to show his bad character and his propensity for committing criminal acts. *Commonwealth v. Banks*, 513 Pa. 318, 349, 521 A.2d 1 (1987); *Commonwealth v. Morris, supra*, 493 Pa. at 175, 425 A.2d at 720. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). As we recently stated in *Banks:*

[T]he general rule prohibiting the admission of evidence of prior crimes nevertheless

allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Commonwealth v. Morris, supra* at 493 Pa. 175, 425 A.2d 715. This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury. *Commonwealth v. Claypool, supra* (evidence of defendant's prior criminal activity is admissible where defendant makes statement about such activity in order to threaten and intimidate victim and where force or threat of force is element of crime for which defendant is being prosecuted).

513 Pa. at 350, 521 A.2d at 17. Another "special circumstance" where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. *Commonwealth v. Murphy*, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the "res gestae" exception to the general proscription against evidence of other crimes, is also known as the "complete story" rationale, *i.e.*, evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." McCormick, *Evidence*, § 190 (1972 2d ed.); *Carter v. United States*, 549 F.2d 77 (8th Cir.1977); *United States v. Weeks*, 716 F.2d 830 (11th Cir.1983); *see also Commonwealth v. Coyle*, 415 Pa. 379, 389–91, 203 A.2d

782, 787 (1964) (evidence of other crimes admissible as these crimes were interwoven with crimes for which defendant was being prosecuted).

In the instant case, the evidence of each of the offenses—murder, terroristic threats, and kidnapping—would have been admissible in a separate trial for the others. Each of these offenses were interwoven in a tangled web of threats, intimidation and criminal activity which arose from the robbery in 1978 of Tae Bong Cho, and were relevant to prove motive, intent, identity (such a logical connection between the crimes that proof of one naturally tends to show that the accused committed the other), and to "complete the story" by demonstrating the history and natural development of the facts.

*Kidnapping*—18 Pa.C.S.A. § 2901.

Appellant was found guilty of two counts of kidnapping which is demonstrated (for our purposes herein) where the person "unlawfully confines another for a substantial period in a place of isolation" with the intent to hold the other as a shield or hostage or to facilitate flight after commission of a felony. 18 Pa.C.S.A. § 2901(a)(1) and (2). This kidnapping stemmed directly from appellant's attempt to avoid capture for his onslaught of criminal activity including his robbery of Tae Bong Cho (and the conviction therefor), the subsequent murder of this victim, and his plans to kill Assistant District Attorney, Charles Cunningham. As such, this evidence demonstrated consciousness of guilt and attempt to escape the consequences of his various crimes. *Commonwealth v. Irons*, 230 Pa.Super. 56, 326 A.2d 488 (1974), interpreting plurality opinion in *Commonwealth v. Peterson*, 453 Pa. 187, 307 A.2d 264 (1973). Moreover, the facts and circumstances surrounding the kidnapping and appellant's arrest provided direct evidentiary links to the other crimes. While holding Sheila Morris and her children hostage, appellant threatened to shoot the police as he did "the chinkee m_____ f_____," a threat which obviously linked him to the shooting of Tae Bong Cho. The blue bag which

appellant had with him at the time of his arrest contained the address and phone number of Mr. Cunningham's parents and grandfather and indicated that he was in the process of carrying out the terroristic threats made to Cunningham when he was spotted, chased and arrested. The murder of Mr. Cho and the terroristic threats against Mr. Cunningham were inextricably interwoven, therefore, with the kidnapping of Ms. Morris and her children and were relevant to show motive, intent and to show the natural development of the case.

*Terroristic Threats*—18 Pa.C.S.A. § 2706

A person is guilty of this crime if he threatens to commit any crime of violence with intent to terrorize another, or in reckless disregard of the risk of causing such terror. 18 Pa.C.S.A. § 2706. As the lower court observed, if the only evidence of this crime were the telephone call on November 26, 1979 to Charles Cunningham, telling Cunningham that he (appellant) was a real aggressive guy who would not let bygones be bygones, the evidence may have been insufficient to prove that appellant threatened Cunningham with a crime of violence with intent to terrorize him. The murder of the victim of the prior robbery for which Mr. Cunningham had successfully prosecuted appellant provided a vital link in the chain of evidence offered by the Commonwealth to prove this offense. Another vital link was supplied by threats communicated to active and retired members of the police department, and by the Cunninghams' address and telephone number in the address book seized from appellant upon his arrest. Here too, the evidence of the murder and of the kidnapping was relevant to the offense of terroristic threats to prove motive, intent, the identity of the telephone caller, and the natural development of the facts.

*Murder of the first degree*—18 Pa.C.S.A. § 2502(a)

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing, i.e., by means of poison or by lying in wait or by any other kind of willful, deliberate and premeditated killing. Obviously, Tae Bong Cho's murderer killed him intentionally, by willfully,

deliberately and with premeditation walking into his store, wearing a mask or stocking to avoid identification, aiming a handgun at the victim's head at close range, assassinating him with a single well-placed shot, and fleeing the scene. However, as there was no eyewitness identification, the killer's identity had to be proven by circumstantial evidence.

The circumstantial evidence introduced by the Commonwealth included admissions of the murder made by appellant to various others and several threats to others to kill them as he did "the Korean." Such admissions and threats were strong evidence against appellant, but the credibility of most of the Commonwealth's witnesses was challenged by appellant whose attorney brought out on cross-examination that they were themselves incarcerated or being prosecuted by the Commonwealth and expected to receive favorable treatment and/or the Commonwealth's cooperation in exchange for their in-court testimony. Thus, the evidence of the terroristic threats made to Assistant District Attorney Cunningham provided a critical link in the Commonwealth's chain of evidence introduced to establish the identity of the killer. The fact that appellant murdered the principle witnesss to a robbery, i.e. the robbery victim himself, and then threatened the Commonwealth's prosecutor in the same robbery case (threats which he was quite capable of, and took steps to carry out), was more than mere coincidence. It was in fact, a common and a chronic pattern with appellant to threaten to eliminate, and in one case actually eliminate, those who stood in his way. The murder of Tae Bong Cho was not an isolated incident but was a critical link in the chain of evidence, along with the other links of threats, intimidation and related criminal activity which began with the first link, the robbery of Tae Bong Cho, and ended with the last link, the kidnapping wherein appellant held a woman and children hostage and threatened to kill the police as he had "the chinkee m_____ f_____." The four principle crimes (robbery, murder, terroristic threats and kidnapping) involved in this case were all linked together, along with the other threats and intimidation, and presented a clear picture of appellant's pattern

of destruction and intimidation of the participants in the criminal justice system.

The terroristic threats against Mr. Cunningham and the kidnapping of Ms. Morris and her children were clearly relevant to shed light on appellant's motive and intent in murdering Mr. Cho, in establishing his identity by showing a logical connection between the crimes and a common and off-repeated pattern of the appellant, and, importantly in this unique case, to show the natural development of the case and to complete the story. Indeed, the events described at trial were interwoven with and naturally developed one from the other, and the evidence of each of the offenses would have been admissible in a separate trial for the other. Appellant is a judicial nihilist. His total behavior was directed at wrecking the truth-seeking function of the system which holds all of us accountable for our behavior.

Nor did the court err in its determination that the evidence of distinct offenses was capable of separation by the jury so that there was no danger of confusion. This trial involved separate and distinct criminal offenses clearly distinguishable in time, space and characters and the evidence, although abundant, was easily capable of separation by the jury. The court's clear instructions to the jury in this case further diminished any danger of confusion of the evidence.

■ Accordingly, we must affirm the court's refusal to sever the offenses charged in a single indictment, unless we find that the court abused its discretion in failing to find that the danger of prejudice to appellant outweighed the value of consolidation of the offenses at trial. Pa.R.Crim.P. Rule 1128. There was no abuse of discretion in refusing to sever these charges, as appellant was not *unduly* prejudiced. The "prejudice" of which Rule 1128 speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of *all* Commonwealth evidence. The prejudice of which Rule 1128 speaks is, rather, that which would occur if the evidence tended to

convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence. Such prejudice was not present in the instant case. As the trial court stated:

> [This was a] series of crimes committed by the [appellant] which were all related. He created the sequence of events and cannot fairly now demand that the three matters be severed and tried in separate trials. Without this consolidation of cases, the Commonwealth could not prove the motive for the homicide. What has been joined together by the [appellant] criminally will not be put asunder by this court. ...
>
> \*    \*    \*    \*    \*    \*
>
> The [appellant] forged his own linkage of events and he deserves to be tried jointly on them.

Opinion of lower court, April 8, 1987, at 4, 46.

The lower court did not, therefore, abuse its discretion in refusing to sever the offenses consolidated by the Commonwealth in a single indictment.

■ Appellant next argues that the trial court erred in admitting evidence of other crimes for which he was not being prosecuted. This evidence complained of consists of the evidence of threats made by appellant to various witnesses in the case, Benjamin Smith, James Spencer, and the investigating police detectives, a statement elicited from Shelia Morris on redirect examination that appellant said he would "beat this charge just like all the others," N.T. Trial, June 21, 1985 at 54, 57, and a reference by the prosecutor during examination of a witness, a police detective, to appellant's "other arrests," N.T. Trial, June 21, 1985 at 166. For the reasons given in the preceding section, the evidence of other threats made by appellant and the statement to Ms. Morris was admissible as it was relevant to establish motive and intent, it had a logical connection to the crimes charged, and additionally, such evidence constituted admissions by conduct showing consciousness of guilt. *See Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234, 243 (1982)

and cases cited therein (Commonwealth may show consciousness of guilt through attempts by defendant to intimidate or influence witnesses.) In rejecting this assignment of error, the trial court stated:

[T]he trial court gave ... a limiting instruction to the jury.

"Now, you have heard evidence which tends to prove that the defendant was guilty of other charges for which he is not on trial here and for which I have not read any definition of those crimes.

Now, this evidence is before you for a very limited purpose. That is, for the purpose of tending to show motive or intent on the part of the defendant. This evidence must not be considered by you in any other way than for the purpose I have just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you must be inclined to infer guilt.

If you find the defendant guilty, It must be because you are convinced by the evidence in this case that he committed the crimes charged here and not because you believe he is wicked or has committed other offenses." (N.T. 6–27–85, P. 36.)

As to Mrs. Morris' testimony in regard to other cases, she was only repeating what the defendant said while he was inside her house. (N.T. 6–21–85, P. 54.) Defense counsel highlighted Mrs. Morris' testimony when he asked her a series of questions about the "other cases" on recross-examination. (N.T. 6–21–85, Pp. 55–57.)

Finally, the prosecutor in one of the many confrontations between counsel made the following remark: "Yeah, not one of his other arrests; his arrest for murder." (N.T. 6–21–85, P. 166.) Defense counsel moved for mistrial based on prosecutorial misconduct and the court denied the motion. The court also instructed the jury that they should "decide the facts in this case." (N.T. 6–21–85, P. 166.) Both counsel, throughout the trial, engaged in strong advocacy and it is the opinion of this

court that the prosecutor's reference to defendant's other arrests did not amount to prosecutorial misconduct nor evidence of other crimes.

In light of the trial court's instruction to the jury regarding evidence of other crimes, and similar comments by defense counsel, the court did not err in admitting such evidence. Defendant's second assignment of error is dismissed.

Opinion of the lower court at 47–48.

We hold that the trial court did not abuse its discretion in permitting the challenged evidence of other threats and/or other arrests and criminal activity to be introduced. Not surprisingly, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged, as appellant would have preferred.

■ Appellant also alleges the trial court erred in denying his motion for mistrial after some members of the jury observed him briefly in handcuffs in the hallway after testimony had closed for the day on June 18, 1985. This alleged incident was brought to Judge Geisz' attention by the deputy sheriff who had been escorting appellant. The court officer who had been escorting the jurors to the elevator in the hallway that day questioned the jurors individually, and apparently found that nothing noteworthy or prejudicial had happened. Defense counsel asked for a mistrial based solely on this vague information before the court, stating specifically that this motion was made "without requesting that [the court] poll any jurors to determine

whether or not they saw Mister Lark." N.T. Trial, June 19, 1985 at 3 (in chambers discussion).

Clearly, the mere *possibility* that some of the jurors *might* have seen appellant briefly in the hallway in handcuffs is not grounds for a mistrial, as a brief viewing of a defendant in handcuffs is not so inherently prejudicial as to strip the defendant of the presumption of innocence. *Commonwealth v. Evans*, 465 Pa. 12, 16, 348 A.2d 92, 94 (1975); ("The incident took place outside the courtroom and the time involved was very brief; if indeed the defendant was observed and the handcuffs were noted, it was hardly the sort of happening that would contaminate the jury's decision-making process.") The court did not err in refusing to grant a mistrial.

■   Finally, appellant alleges he was prejudiced by references made by the prosecutor to facts not of record during his summation to the jury. During closing argument, the prosecutor indicated that appellant "has a manner of carrying his gun in the same fashion as the murderer; that is, stuffed down in the middle of his back under his belt." N.T. Trial, June 26, 1985 at 175–76. The record indicates that this fact—appellant's habit of tucking his gun in his pants in back—was *in fact* introduced to the jury by the Commonwealth through the out-of-court statement of a witness, Michael Johnson. Mr. Johnson had given a written statement to the police on September 14, 1979 which indicated that appellant carried his gun "in the back, tucked in his pants." N.T. Trial, June 14, 1985 at 113. The witness could not recall this specific statement when called to testify at trial (he explained he had been hit in the head with a baseball bat, and had trouble remembering past events), although he did authenticate the signed statement of September 14, 1979 as his own and stated that he told the truth at that time. Accordingly, the court allowed the out-of-court declaration to be read to the jury under the "past recollection recorded" exception to the hearsay rule. *See Commonwealth v. Cooley*, 484 Pa. 14, 398 A.2d 637 (1979). Appellant does not now challenge the propriety of that

ruling, and as the evidence in question was before the jury (and properly so), this allegation of prosecutorial misconduct is without merit.

■ As required by section 9711(h) of the Sentencing Code, we have independently examined the record of the trial and sentencing proceeding in this case. We find the evidence sufficient to establish, beyond a reasonable doubt, the existence of the aggravating circumstance found by the jury, that appellant's "victim was a prosecution witness to a ... felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any ... criminal proceeding involving such offenses." 42 Pa.C.S.A. § 9711(h)(3)(ii) and (d)(5).

We have also determined that the sentence of death was not "the product of passion, prejudice or any other arbitrary factor," but was, rather the product of the evidence of the murder and of the aggravating circumstance found by the jury which, given the jury's failure to find any mitigating circumstances, required a sentence of death. 42 Pa.C.S.A. § 9711(h)(3)(i).

Finally, we have reviewed the data and information pertaining to similar cases that has been compiled by the Administrative Office of Pennsylvania Courts pursuant to this Court's directive as set forth in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 707–08 (1984), (see appendix for data collection instrument and form), *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Our review of that data discloses that the sentence of death is neither excessive nor disproportionate to that imposed in similar cases involving this aggravating circumstance (killing a prosecution witness to prevent him from testifying against appellant). *See Commonwealth v. Stoyko*, 504 Pa. 455, 475, 475 A.2d 714, 724 (1984), *cert. denied* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984); 42 Pa.C.S.A. § 9711(h)(3)(iii).

For the foregoing reasons, we affirm appellant's convictions and his judgments of sentence, including his judgment

of sentence of death.[7]

---

7. The prothonotary of the eastern district is directed to transmit to the Governor, as soon as possible, the full and complete record of all proceedings below and of review by this Court. 42 Pa.C.S.A. § 9711(i).