J-A29028-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RICO RAMONE RODGERS | : | |
| | : | |
| Appellant | : | No. 86 WDA 2024 |

Appeal from the Judgment of Sentence Entered June 12, 2023
In the Court of Common Pleas of Beaver County Criminal Division at
No(s): CP-04-CR-0001188-2022

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                    **FILED: May 7, 2025**

Rico Ramone Rodgers ("Rodgers") appeals from the judgment of sentence imposed following his bifurcated trial convictions for murder in the first degree and persons not to possess firearms.[1] We affirm.

The Commonwealth charged Rodgers and Jeffrey Alford ("Alford") with the fatal shooting of Curtis Flowers, III (the "Victim"), on the afternoon of November 24, 2020, in a neighborhood of Aliquippa, Beaver County, known variously as Plan 11, Plan 11 Extension, and the Hill. At trial, the Commonwealth presented testimony that there were "rivalries" between this area and the neighborhood of Linmar Terrace. N.T., 4/11/23, at 91; *see also* N.T., 4/13/23, at 29. Isaiah McCoy ("McCoy"), who was friends with the Victim, Rodgers, and Alford, testified that Rodgers and Alford were affiliated

---

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 6105(a)(1).

with the Hill while the Victim "[a]ssociated with both" factions. N.T., 4/13/23, at 30. Several eyewitnesses saw parts of the shooting and/or two men fleeing from the scene, but initially no witness identified either man. Pennsylvania State Police ("PSP") Trooper Patrick Thomas ("Trooper Thomas") testified that it was "extremely difficult" to get "witnesses to cooperate and come forward in this investigation." *Id*. at 167.

We note that Rodgers' and Alford's charges were initially joined for trial, but Alford entered a guilty plea to homicide in the third degree before Rodgers' trial. No eyewitness identified Rodgers as one of the two shooters. Instead, the Commonwealth presented the following circumstantial evidence at trial.

Witness John Slappy ("Slappy") testified at trial to the following. He was at the intersection of Davis Street and Wykes Street, in the Plan 11 neighborhood, in his truck and he heard multiple gunshots. He looked "down Wykes Street" and saw "a kid," who was the Victim, run toward him with "two kids behind" him. N.T., 4/11/23, at 200. Slappy saw the Victim fall down. The gunshots "sounded like . . . two different guns," based on his military experience and "know[ing] what a gun sounds like." *Id*. at 202, 203. When asked if he observed the Victim being shot, Slappy responded that he "saw like the end of it" and did not "know how it started." *Id*. at 208. Slappy was "99 percent sure" that the people pursuing the Victim were Black males. *Id*. at 202. After the Victim fell, the two men "turned around and ran back toward . . . Todd" Street. *Id.* Slappy called 911.

The forensic pathologist opined that the Victim died by a gunshot wound that penetrated his right eye and exited through his skull. Police discovered fifteen shell casings in separate groupings. The Commonwealth's expert witness opined that the ten casings were fired by one gun and the remaining five were fired by a different gun. However, the authorities subsequently learned, from the Victim's family and friends and anonymous calls, that Rodgers and Alford were involved.

PSP investigators obtained a video from a Ring doorbell camera from 315 Wykes Street. The Commonwealth played this video at trial. It showed the Victim "walking up Wykes Street towards Davis Street, and you hear a series of shots being fired after someone yells, hey, hey, yo." N.T., 4/11/23, at 134. Another surveillance video, from a home on Todd Street, showed two individuals running from the area of the shooting immediately after the shooting.

Eventually, an eyewitness, Karma Jackson ("Jackson"), identified Alford as one of the shooters. At trial, she testified that she was in the driver's seat of a car parked outside 213 Wykes Street, facing Davis Street. Jackson saw a man walk past her left window, in the same direction she was facing, and drop something on the ground. That person "turned around, looked [directly at her face, and] picked it up." N.T., 4/12/23, at 63, 65. Jackson observed another man walking past the right side of her vehicle, in the same direction, but he did not turn around and she did not see his face. *Id*. at 65. The two

men, who were "young," walked about "three steps" in front of her car and stood in the middle of the street, with their "hands out" toward Wykes Street. *Id*. at 65-66, 68. Jackson saw them both fire guns and heard fifteen to twenty gunshots. There was no one else in the street. Jackson then "look[ed] up the street" and saw "a body fall. When the body hit the ground, [the two men] started running . . . up Scott Street." *Id*. at 68.

Jackson talked to the police within a day or two of the murder. Sometime later, she was presented with a photo array. Jackson felt she could identify the person on the left side of her car "[w]ithout a doubt," but was scared and reluctant to do so. *Id*. at 71-72. Jackson put her "hand near the person's face" and told police "they were on the right track." *Id*. at 73. In a later police interview, after "one of the people got arrested," Jackson identified Alford as the man on the driver's side of her car who looked at her. *Id*.

However, we note that PSP Trooper Clayton McGeary ("Trooper McGeary") agreed that in an earlier statement to police, Jackson reported having observed only one person fire a gun. *See* N.T., 4/13/23, at 129.

Kyasha Pope ("Pope") testified she was friends with the Victim and knew Rodgers, the latter of whom she identified as "affiliated with the [H]ill." N.T., 4/12/23, at 51. A couple weeks after the murder, Pope viewed a Facebook Live video, showing Rodgers with a gun and talking with Stephon Peake ("Peake"). Pope "screen recorded" the video and provided it to the detectives. *Id*. at 44. Just before trial, Rodgers filed a pre-trial motion *in limine* to exclude

- 4 -

the video. The trial court held a hearing on the first day of trial and permitted the video.

At trial, the Commonwealth played the video during Pope's direct examination, pausing the video at times to ask Pope questions about it. *See id*. at 50-51. In the video, Rodgers talked about his late friend, known as "Staxx," and stated people were "smoking on Staxx," a term of disrespect. *Id*. at 41. Rodgers also said about himself, "You can't tell me [I] ain't shit." *Id*. at 52. Additionally, Rodgers made "a lot of comments about" the Victim, with Peake telling him to not say the Victim's name. N.T., 4/11/23, at 17-18 (Commonwealth describing the video during sidebar argument on Rodgers' motion *in limine* to exclude the video at trial). Peake told Rodgers, "[Y]ou know [the Victim] ain't had nothing to do with that shit," and Rodgers responded, "I don't give a fuck N [*sic*]. You be with them Linmar Ns [*sic*] you get killed too." *Id*. at 18.

PSP Corporal Ryan Boughter ("Corporal Boughter") interviewed Rodgers on February 6, 2021, approximately two and one-half months after the shooting. During his examination at trial, the Commonwealth played the Facebook Live video a second time, over Rodgers' objection. *See* N.T., 4/12/23, at 135-37. In permitting the second playing, the trial court instructed the Commonwealth could not present "further commentary" by the witness. *Id*. at 137.

Next, the Commonwealth played a video of Corporal Boughter's interview with Rodgers, which showed Rodgers: (1) initially denying he was in Beaver County on the day of the shooting; (2) but then stating he was in New Brighton, but not Aliquippa; and (3) finally stating he was at the scene of the shooting "right up to the shooting," left with Alford "right before" the shooting, although they heard the gunshots. *Id.* at 144, 147-48. The video further showed Rodgers stating that: (1) "people don't belong up on the [H]ill if they're not from the [H]ill;" (2) the Victim "had dropped his pin or location in the [H]ill area[, and i]t was disrespectful;" (3) the Victim "was on some weird shit . . . kind of playing with both sides being at Linmar and the [H]ill," and this may be why the Victim died; and (4) he (Rodgers) made a video of himself "being disrespectful with" a teddy bear taken from the Victim's grave site. *Id.* at 144, 146-48. We note the Commonwealth played: (1) a third video, showing Rodgers putting "out a blunt or a cigarette" on the bear; and (2) a rap video, in which Rodgers held a gun to the teddy bear. N.T., 4/13/23, at 21, 170.

Corporal Boughter further testified about Rodgers' additional statements, which were not recorded. According to the officer, Rodgers stated the following. Just prior to the shooting, Rodgers was at a house at 209 Wykes Street with Alford and McCoy (whose testimony we briefly summarized above). From inside the home, Rodgers saw the Victim walking outside and told the others, "'There's go the opps,' or the opposition," but then quickly

said, "Nah, just playing. It's little Curt," the Victim. N.T., 4/13/23, at 15-16. Rodgers and Alford went outside "and started walking down Wykes Street in the direction of" the Victim. *Id*. at 16. Alford dropped his phone next to a vehicle, made eye contact with the woman inside the vehicle, and picked up the phone. Alford then brandished a gun and yelled, "Yo, cuz," and started shooting. *Id*. Rodgers stated he ran from the scene with Alford because he did not have a gun, "so [it was] either stay and get shot or go with" Alford. *Id*. Rodgers got a ride out of the area and threw his jean jacket, that he had worn that day, into a dumpster. Rodgers told Corporal Boughter he knew the police had a video of him running on Todd Street away from the scene.

Rodgers did not testify in his own defense, but presented several exhibits as evidence. The jury found Rodgers guilty of murder in the first degree and the trial court found him guilty of the severed charge of persons not to possess firearms.

On June 12, 2023, the trial court imposed a sentence of life imprisonment and a concurrent term of five to ten years' imprisonment, both to run consecutive to a life sentence imposed for homicide in another matter.

Rodgers initially filed a timely post-sentence motion, in which he also requested the appointment of new counsel. The trial court appointed present counsel, and granted several extensions of time to file an amended post-sentence motion. Rodgers ultimately filed a supplemental post-trial motion

for relief on December 15, 2023, which the trial court denied. Rodgers then filed a timely notice of appeal.[2]

Rodgers raises four issues for our review.

[1.] Whether the trial court erred in denying [Rodgers'] motion *in limine* and admitting into evidence an overly prejudicial "Facebook Live" video.

[2.] Whether the trial court erred in allowing the aforementioned "Facebook Live" video to be shown to the jury a second time, further prejudicing [Rodgers] and being unnecessarily cumulative.

[3.] Whether the Commonwealth presented sufficient evidence to prove [Rodgers] guilty beyond a reasonable doubt.

[4.] Whether the jury's verdict was against the weight of the evidence presented by the Commonwealth at trial.

Rodgers' Brief at 3 (unnecessary capitalization omitted).

Rodgers' first and second issues challenge evidentiary rulings involving the presentation of the Facebook Live video. We consider the applicable standard of review:

Questions concerning the admissibility of evidence are "within the sound discretion of the trial court . . . [and] we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion." "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record."

---

[2] The trial court did not require Rodgers to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

*Commonwealth v. Belknap*, 105 A.3d 7, 9 (Pa. Super. 2014) (citations omitted).

"The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Collins*, 888 A.2d 564, 577 (Pa. 2005). Pennsylvania Rule of Evidence 401 explains: "Evidence is relevant if: . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). Generally, "[a]ll relevant evidence is admissible . . . . Evidence that is not relevant is not admissible." Pa.R.E. 402. A trial "court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Pa.R.E. 403.

We note that in reaching its decision, the trial court relied on *Commonwealth v. Gwaltney*, 442 A.2d 236 (Pa. 1982).[3] In that matter,

_____

[3] We note *Gwaltney* was decided before our Supreme Court enacted the Rules of Evidence in 1998, and the appeal arose in collateral proceedings. Nevertheless, this Court has positively cited *Gwaltney* for the principles we discuss above. *See, e.g., Commonwealth v. Brinkley*, (Pa. Super. 2024) (unpublished memorandum at 6-7) (discussing *Gwaltney*'s holding that the trial court properly admitted evidence of the defendant's gang affiliation, and the relationship between his gang and the deceased victim's gang, as the evidence was relevant and probative of the defendant's motive to stab the victim); *Commonwealth v. Reyes-Acosta*, 303 A.3d 779 (Pa. Super. 2023) (unpublished memorandum at 9) (citing *Gwaltney* for the principle that "motive, while not an element of a crime, is always relevant in criminal
*(Footnote Continued Next Page)*

the jury found the defendant guilty of murder in the third degree and conspiracy. *See id*. at 238. At trial, the Commonwealth presented evidence that: the defendant was a member of a gang and the victim was a member of a rival gang; the victim had stabbed a member of the defendant's gang; and other witnesses were members of various gangs. *Id*. at 241. The Pennsylvania Supreme Court held the trial court properly admitted this evidence, as "evidence to prove motive, intent, plan, design, ill will or malice is relevant in a criminal case." *Id*. The Court determined that evidence of the relationship between the defendant's and the victim's respective gangs, and the victim's alleged stabbing of a member of the defendant's gang was "certainly probative of [the defendant's] possible motive." *Id*.

> Finally, we note:
>
> [A] court is not . . . required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged[.]

*Commonwealth v. Lark*, 543 A.2d 491, 501 (Pa. 1988).

On appeal, Rodgers first avers the trial court erred in denying his motion *in limine* to preclude the Facebook Live video at trial. In support, he contends the video was not relevant, as it "did not logically tend to prove a material

---

cases"). *See also* Pa.R.A.P. 126(b)(1)-(2) (providing that unpublished non-precedential memorandum decisions of the Superior Court, filed after May 1, 2019, may be cited for their persuasive value).

fact[,] tend to make a fact at issue more or less probable, or support a reasonable inference regarding a material fact." Rodgers' Brief at 10. Rodgers maintains the video merely showed he had indifference toward the Victim, and his statements expressed a view held by many others, including Commonwealth witnesses at trial — that the Victim "was shot because he was attempting to associate with factions from both the Plan 11 and Linmar Terrace neighborhoods." *Id*. at 10-11. Rodgers insists that he "never state[d] that he was in any way responsible for or involved in [his] death," and thus the video did "not make it more probable[ he] was responsible for or contributed to the death of" the Victim. *Id*. Rodgers alleges: (1) the video "misled the jury [by] suggesting that [his] statements and actions in the video were tantamount to an admission;" and (2) "the jury made [its] decision on an improper basis or [its] attention was diverted away from [its] duty of weighing [all the] impartially." *Id*. at 13-14.

Alternatively, Rodgers asserts that the prejudicial nature of the video far outweighed its probative value. He reiterates that the video showed he displayed "a callous indifference to the death of [the Victim,] while brandishing a firearm." *Id*. at 13. Rodgers reasons that the Commonwealth thus suggested, through the video that he "plays with firearms and believes that anyone from Linmar Terrace would be killed by him as in the case of" the Victim. *Id*.

In his second issue, Rodgers asserts the trial court erred in permitting the Commonwealth to play the video a second time at trial. We reiterate the Commonwealth played the video: (1) during Pope's testimony, as she explained some of the references or slang in the video; and again (2) during Corporal Boughter's testimony. Rodgers maintains that replaying the video was overly prejudicial and unnecessarily cumulative, and "gave the video even more inappropriate weight and emphasis." Rodgers' Brief at 14.

In permitting the Facebook Live video, the trial court considered the "[e]xtensive discussion" at the motion *in limine* hearing as to the video's admissibility and purpose. Trial Court Opinion, 3/7/24, at 12. First, the court found the video was relevant, and its probative value "cannot be understated." *Id*. at 13. The trial court reasoned:

> While other testimony could have alluded to what motive [Rodgers] had as an affiliate of the Plan 11 group, this video shows him specifically speaking about the turf war, his own friends that have died related to gang activity, and multiple instances of him speaking about the [V]ictim, including statements that associating with Linmar [Terrace] gets one killed. This video places the impetus of animosity on [Rodgers] and establishes a motive and intent through statements directly made by the accused party himself. For these reasons, this Court denied the motion and found the video to be more probative than prejudicial.

*Id*. As stated above, the trial court relied on **Gwaltney**, which held evidence relating to gang activity is admissible to show a defendant's possible motive.

With respect to the showing of the Facebook Live video a second time, the trial court reasoned:

. . . On initial showing, the testifying perspective came from [Pope, a] friend of the [V]ictim, familiar with the terms, characters, and places . . . referenced in the video.

The second showing came [during Corporal Broughton's examination,] with no testimony of its own, but significant time and testimonial evidence had passed between the two showings. This [c]ourt finds that the jury could have gained new insights from the second showing of the video, having heard more testimony and had additional time to reflect on the other evidence between the first and second showing.

Furthermore, even if the second showing of the video was cumulative, for the reasons outlined in [discussing the motion *in limine* issue,] the video was still properly admitted and therefore any resulting error was harmless.

Trial Court Opinion, 3/7/24, at 15 (paragraph breaks added) (*citing*

***Commonwealth v. Spotz***, 756 A.2d 1139 (Pa. 2000) (rejecting the

defendant's "argument that the videotapes were cumulative and repetitive,

[where] the trial court could reasonably conclude that the jury could glean

additional insights from viewing videotape in addition to still photographs and

charts")).

After review of the record, we first determine the trial court did not

abuse its discretion in admitting the Facebook Live video. ***See Belknap***, 105

A.3d at 9. Rodgers' arguments are not persuasive. Initially, we disagree with

his premise, that in the video, he merely espoused an opinion already

presented by other witnesses at trial — that people "who maintain alliances

with individuals from Linmar Terrace and ***transgress*** into the Plan 11 section

***can expect to be killed***." Rodgers' Brief at 11 (emphases added). While

other witnesses did testify there was a rivalry, or even a feud, between the

- 13 -

two neighborhoods, Rodgers does not cite the place in the record where witnesses also opined that an affiliate of the rival neighborhood should "expect to be killed" for merely entering this neighborhood. *Id*. Additionally, contrary to Rodgers' reasoning, the video did present new evidence: that he himself held such beliefs. Finally, the fact that Rodgers did not explicitly admit to killing the Victim did not, on its own, render the video irrelevant. Instead, the trial court appropriately found that the video was relevant to show Rodgers' motive, where he was on trial for fatally shooting the Victim. *See Gwaltney*, 442 A.2d at 241. Thus, no relief is due on this claim.

With respect to the trial court's allowing the Commonwealth to play the video a second time, we similarly find no abuse of discretion. As stated above, in allowing the second showing, the trial court instructed the Commonwealth it could not present any further witness commentary. *See* N.T., 4/12/23, at 137. Furthermore, the trial court reasoned that a "significant time and testimonial evidence had passed between the two showings," and thus "the jury could have gained new insights from the second showing of the video, having heard more testimony and had additional time to reflect on the other evidence." Rodgers does not dispute this reasoning. We reiterate that a trial court is not "required to sanitize the trial to eliminate all unpleasant facts[,] where those facts are relevant . . . and form part of the history and natural development of the events and" the charged offenses. *Lark*, 543 A.2d at 501.

In the absence of any persuasive argument, we conclude no relief is due on Rodgers' first and second issues.

Rodgers' remaining two issues are shorter in length, each spanning less than two pages in his argument section. In his third issue, Rodgers asserts the Commonwealth failed to present sufficient evidence of homicide beyond a reasonable doubt.[4] We consider the applicable standard of review:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Juray*, 275 A.3d 1037, 1042 (Pa. Super. 20220 (citations omitted).

The Crimes Code defines the offense of murder in the first degree as follows: "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. 2502(a).

On appeal, Rodgers maintains: the evidence was "inconclusive;" "[n]one of the surveillance video . . . showed [him] with a firearm or shooting a firearm;" none of the eyewitnesses at the scene of the crime identified him,

---

[4] Rodgers does not present any argument challenging his conviction of persons not to possess firearms, which is defined as follows: "A person who has been convicted of an [enumerated offense ] shall not possess[ or] use . . . a firearm in this Commonwealth." 18 Pa.C.S.A. 6105(a)(1).

nor saw him firing a gun; Commonwealth witness Jackson saw two people running from the scene after the gunshots, but she identified only Alford, and no one else; and "the only person positively identified by an eyewitness," Alford, pleaded guilty to murdering the Victim. Rodgers' Brief at 15-16 (some punctuation omitted).

Here, the trial court reasoned:

> There was more than enough evidence presented throughout the trial to show that [Rodgers] was one of the two shooters responsible for the murder of the [V]ictim. First, he admitted to being with the other shooter at the time of the shooting. Next, a witness who was near . . . to the shooting saw and heard two individuals shoot the victim. Several witnesses distinctly heard two guns being fired. Forensic evidence displayed that there were two different guns used, in two locations, almost certainly by two shooters. Both of the shooters were wearing jean jackets on the day of the shooting, as evidenced through the testimony of multiple witnesses. [Rodgers] admitted as much, including admitting to throwing it away after fleeing the scene.

> Additionally, there was overwhelming evidence showing [Rodgers'] state of mind regarding the murder. He made statements about the [V]ictim's death alluding to his involvement and that the [V]ictim "should not have been on the [H]ill." Furthermore, [Rodgers] was seen in a rap video desecrating a teddy bear taken from a shrine to the [V]ictim. It is clear from testimony and [Rodgers'] own recorded statements and attitudes that he clearly had strong feelings about the [V]ictim's presence on his turf. Finally, the action of drawing a firearm and firing five to ten shots at the [V]ictim until the [V]ictim was felled is enough, when coupled with the above circumstances, to show that [Rodgers] had the requisite intent to kill required for a conviction of murder of the first degree. For all of the reasons outlined above, this court finds that there was sufficient evidence for a reasonable jury to find [Rodgers] guilty of murder of the first degree.

- 16 -

Trial Court Opinion, 3/7/24, at 10-11 (unnecessary capitalization and citations omitted).

After review of the trial evidence, viewed in the light most favorable to the Commonwealth, we agree with the trial court that the evidence was sufficient to support all the elements of murder in the first degree. *See Juray*, 275 A.3d at 1042. On appeal, Rodgers does not address or dispute any of the trial court's reasoning. Rodgers told Corporal Boughton that just before the shooting, he was inside a home on Wykes Street with Alford, when he saw the Victim walking outside. Rodgers admitted that he and Alford followed the Victim, although Rodgers stated that he did not have a gun, and only Alford fired at the Victim. Rodgers also told the corporal that: people who are not "from the [H]ill" "don't belong up on the [H]ill;" the Victim "had dropped his pin or location in the [H]ill area[, and i]t was disrespectful;" the Victim likely died because he was "playing with both sides being at Linmar and the [H]ill." N.T., 4/12/23, at 144, 146-48.

Jackson testified that she observed two people shooting, although she could only identify one — Alford. Slappy testified that he saw two men pursuing the Victim and believed the gunshots came from two different guns. Police discovered fired shell casings in separate areas and the Commonwealth's expert opined that they came from two different guns. Finally, the Commonwealth's videos showed: Rodgers making a lot of comments about the Victim; discussing people who were disrespecting his late

- 17 -

friend, "Staxx;" Peake telling him that the Victim "had nothing to do with that shit," and Rodgers responding that he did not care and that people who are with Linmar will "get killed too;" and Rodgers putting out a cigarette and holding a gun to a teddy bear taken from the Victim's shrine, following his death. N.T., 4/11/23, at 17-18; *see also* N.T., 4/12/23, at 41. The jury was free to weigh all of this circumstantial evidence and conclude the Commonwealth proved, beyond a reasonable doubt, all the elements of murder in the first degree. *See Juray*, 275 A.3d at 1042; *see also* 18 Pa.C.S.A. § 2502(a). Accordingly, we determine no relief is due on Rodgers' third issue.

In his final issue, Rodgers asserts "[t]he weight of the evidence presented does not support a finding of guilt beyond a reasonable doubt to" murder in the first degree and persons not to possess firearms. Rodgers' Brief at 16. We consider:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the

> trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> Thus, to allow an appellant "to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the [trial] court."
>
> * * * *
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Juray*, 275 A.3d at 1046-47 (citations omitted).

> On appeal, the sum of Rodgers' argument is as follows:
>
> Based on the arguments, *supra*, [Rodgers] submits that the jury inappropriately considered the aforementioned overly prejudicial "Facebook Live" video along with all the other evidence presented and misapplied the law to the facts in reaching its verdict. Therefore, the jury's misapplication of the law to the facts [*sic*] and evidence presented at trial must shock the conscience of this. . . Court and warrant a remand for a new trial, or in the alternative warrant a discharge.

Rodgers' Brief at 17. We also consider an argument presented in his

sufficiency of the evidence discussion — that although Jackson testified at trial

- 19 -

that she saw two shooters, in an earlier statement to police, she reported observing only one person firing a gun.[5]

The trial court denied relief on this issue, reasoning:

> This court, on review of the whole of the trial record, does not find the verdict reached by the jury to be contrary to the evidence presented, nor to be of any injustice at all. The verdict reached by the jury sits soundly on a bed of interlocking testimony and video evidence, of which the jury was free to believe all, some, or none of. For this reason, this court finds that [Rodgers] is not entitled to a new trial based on the verdict being against the weight of the evidence.

Trial Court Opinion, 3/7/24, at 12 (unnecessary capitalization omitted).

After our review, we determine the trial court did not abuse its discretion in denying relief on Rodgers' weight claim. *See Juray*, 275 A.3d at 1046-47. We have rejected Rodgers' claim, above, that the Facebook Live video was overly prejudicial, and we determined its admission was proper; thus, we deny relief on any argument that the jury "inappropriately considered" it. Rodgers'

---

[5] This argument — that a witness' testimony or other evidence should not be believed because it conflicted with other evidence — goes to the weight, not the sufficiency, of the evidence. We remind counsel:

> [A] sufficiency of the evidence review does not include an assessment of credibility of testimony offered by the Commonwealth. Instead, such arguments are more properly characterized as challenges to weight of evidence. [A] claim that the jury erred in crediting a victim's version of events over that of [the defendant] goes to the weight, not to the sufficiency of the evidence).

*Juray*, 275 A.3d at 1043 (citations omitted).

- 20 -

Brief at 17. With respect to Jackson's trial testimony — that she observed two shooters — conflicting with her earlier statement to police — that she only saw one shooter — the jury was free to weigh both statements and assess Jackson's credibility overall. Furthermore, as stated above, the jury was free to weigh the Facebook Live video and Jackson's testimony against all the other evidence presented at trial, including Rodgers' initial statements to police denying he was in the area. We do not reweigh the evidence, and instead defer to the trial court's assessment of Rodgers' weight claim. ***See Juray***, 275 A.3d at 1046-47. For these reasons, we conclude no relief is due on Rodgers' final issue.

For the foregoing reasons, we determine none of Rodgers' claims merit relief. Thus, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/07/2025

- 21 -