J-A19002-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN IRA BRONSON, JR., | |
| Appellant | No. 560 WDA 2012 |

Appeal from the Judgment of Sentence Entered March 2, 2012
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0002217-2011

BEFORE:  BENDER, P.J.E., OLSON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED OCTOBER 1, 2014**

Appellant, John Ira Bronson, Jr., appeals from the judgment of sentence of life imprisonment[1] following his conviction for first degree murder, criminal conspiracy, and criminal solicitation.  Appellant claims that the evidence was not sufficient to support his conviction and that the verdict was against the weight of the evidence.  He also contends that the trial court erred in permitting the consolidation of his case with that of his co-conspirator, Michael Duncan.  Additionally, he asserts that the trial court erred in permitting the Commonwealth to call a witness, Robert Bedner, where Appellant contends that the Commonwealth's sole purpose for calling

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant was also sentenced to a consecutive term of 10–20 years' incarceration.

the witness was to impeach him with a recording of a recanted out-of-court statement. Finally, Appellant claims that the trial court erred by denying his motion to compel the Commonwealth to disclose records concerning the victim's work as a confidential informant. After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

John Lynn Newman ("Newman") was shot to death on February 3, 2003, in California, Pennsylvania. On January 24, 2012, a jury found that Newman's death was the result of a conspiracy and/or solicitation between [Appellant] … and his co-defendant at trial, Michael Clark Duncan ("Duncan"). Any complete summary of the facts for the intervening nine years must begin with the circumstances that led to this conspiracy and/or solicitation.

In 2002, Newman was approached by the PSP [(Pennsylvania State Police)] and informed "that he had been investigated and [that] felony drug charges against him [were] pending." In October of that year, Trooper Aaron Borello ("Trooper Borello") approached Newman about becoming a confidential informant ("C.I.") for the PSP. Trooper Borello and Newman then set about performing a buy/bust involving Newman's supplier, [Appellant]. After [Appellant] was observed selling 200 pills of Oxycodone to Newman, he was arrested. The PSP searched [Appellant]'s home and found about $384,000 in cash which was seized.[1]

_____

[1] [Appellant] eventually pled guilty to drug trafficking and was incarcerated.

_____

After his arrest, [Appellant] began acting as a C.I., first with the PSP and then for the Federal Bureau of Investigation ("F.B.I."). While working with the PSP, [Appellant] asked Trooper Borello directly if it was Newman who had informed on him. Unfortunately, [Appellant]'s participation as a C.I. was fruitless and ended "within a week" prior to Newman's death.

At some point after [Appellant]'s arrest, Duncan spoke with his associate, Howard Irwin ("Irwin"), about another man, "[Michael] Bowman ("Bowman"), having some type of hookup where he [could] make some money … taking care of [an unnamed] snitch." Irwin then witnessed, at his home, a meeting between Duncan, [Appellant], and Bowman, a drug dealer and associate of [Appellant]. During the meeting, [Appellant] asked Duncan to kill Newman and Duncan agreed. [Appellant] asked Bowman to cooperate in the killing, but Bowman declined.

Prior to Newman's death, Robert Bedner ("Bedner") called Brian Dzurco ("Dzurco"). Phone records revealed that the call occurred on January 20, 2003, about two weeks before the death of the victim. Bedner put [Appellant] on the phone with Dzurco, who asked Dzurco to set up a meeting with Newman. Dzurco agreed because he believed the matter to be related to a drug debt. After receiving information that the meeting might be fatal for Newman, Dzurco chose not to arrange it. Shawn Geletei ("Geletei") testified that, while in jail, Duncan approached him and bragged about his intention to murder Newman. He recalled that the conversation was prior to Newman's death. Geletei specifically testified:

> [Duncan] come over and asked if I knew Newman. I said, yeah. He says, I'm going to take his ass out. And he started saying something about [Appellant] and drugs and all this. I said, I'm only in here [in jail] for child support, I don't want to get involved in this. And he kept on running his mouth saying about him being a monster and taking people out before and all this.

Through phone records and witness testimony, the following timeline of February 3, 2003, being the day of the killing, was revealed:

At 7:32 p.m.[,] a call was made from Newman's cell phone to Brian Horner ("Horner"), which lasted 3 minutes and 19 seconds. Sometime before 8:00 p.m.[,] Newman asked his wife for $300.00, ostensibly for cartons of cigarettes, but was, most likely, to buy heroin. At 7:56 p.m.[,] a call was made from Newman's cell phone to Horner, which lasted 1 minute and 9 seconds. Sometime after receiving the money, Newman left the house. He met Geletei in the alley between their houses to discuss acquiring Oxycodone. Geletei told Newman that he could

- 3 -

not locate any Oxycodone. Newman told Geletei that he was going to meet Horner.

Upon returning home, Newman informed his wife that Horner needed a ride and he left again. At 8:08 p.m.[,] Newman called a drug client named Amelia Pajerski ("Pajerski"). At approximately 8:30 p.m.[,] Newman sold Pajerski stamp bags of heroin. He told Pajerski that the heroin was from Horner. Pajerski specifically recalled being home in time to watch a favorite show by 9:05 p.m. At approximately 9:00 p.m.[,] Newman's daughter heard the distinctive sound of her father's car pass by their house. At 9:03 p.m.[,] Newman called Geletei's landline, which lasted for 6 seconds. Thereafter, Newman was killed by a bullet fired at close range while he was sitting in his car, which was parked down the street from his home.

Next, the record reveals the events of February 4, 2003, as follows: Early in the morning, Newman's daughter noticed his car parked down the street from their house. She observed her father inside the car, but the car door was locked. Upon returning to the car with Mrs. Newman, they found the victim dead and contacted the authorities. The police searched the scene and located a spent bullet casing inside the car, and an unfired cartridge outside of the vehicle. Newman had $115.00 in cash, a marijuana "roach", a cell phone, and ten packets of heroin. Around 12:00 p.m.[,] Ryan Givens called Duncan to inform him that Newman had been killed, to which Duncan responded, "snitches get dealt with." The authorities took Horner in for questioning and tested his hands for gunshot residue. The results allowed the tester to state "that [Horner] could have fired a gun, could have come in contact with something that had gunshot primer residue on it," or "that [Horner] was in very close proximity to a firearm when it was discharged."

It took several years for charges to be filed in this "cold case[."] The relevant events of the years are summarized herein:

In March, 2003, Irwin asked Duncan to wire money to him while on vacation. The money, being $931.00, was transferred on March 10, 2003. Also in early March, Duncan appeared early one morning at the home of his drug associate, Gerald Hull ("Hull"). Hull's home was used to cook and store crack cocaine.

Duncan opened a safe located within the Hull residence, to which only he and Irwin had access. At that time, Duncan was heard making a call. The exact nature of the call was unclear. However, Hull, who was admittedly high on crack at the time, recalled hearing Duncan speak about shooting someone. Duncan, who appeared "giddy, nervous, [and] agitated," pointed a gun in Hull's face before leaving.

When Irwin later returned from vacation, he discovered that Duncan had "disappeared[."] Irwin f[ound] that the safe had been emptied. The safe's contents, being money, drugs and a nine millimeter (9 mm) pistol, were missing, and only a cell phone was left behind.

In April of 2003, while on furlough, Bowman spoke with Duncan, who told Bowman that he killed Newman, and explained the manner in which he did it. Duncan told Bowman that he was in the rear of Newman's car and shot him in the left ear. Between April and June of 2003, Bowman had a three-way call with a woman and Duncan. Again, Duncan admitted that he killed Newman.[2]

_____

[2] The Court notes that the testimony regarding this call was elicited from Bowman on cross-examination. Defense counsel asked Bowman "you are saying … that [Duncan] made a three-way call in a recorded jail call where he goes, yeah, that's right, I killed that guy; is that what you are saying to the jury?" Bowman answered "That's exactly what I'm telling the jury."

_____

In September of 2003, PSP Trooper James Monkelis ("Trooper Monkelis") and Trooper Beverly Ashton ("Trooper Ashton") interviewed Duncan. He denied having ever been in California, PA, and denied knowing Newman. When told of Newman's death, Duncan said that he did not "whack" him, despite not being told the nature of Newman's death.[3] Duncan also identified Newman as a snitch. Newman's role as a C.I. had not been released to the public. Duncan made other inculpatory statements, such as:

1. Stating that "hypothetically" someone, implying Newman, owed someone else, implying [Appellant], a lot of money.

- 5 -

2. Stating that he could not do the time and worrying that he would rather not be 45, 46 or 46, 47 at the clubs."

3. In response to the interviewer stating that it might have been self-defense, he stated "come on, man, you seen that crime scene, it couldn't have been self[-]defense."[4]

_____

[3] The Court notes that it was public knowledge that Newman had been killed.

[4] The Court notes that no crime scene photos had been released at the time of the interview.

_____

In late 2003, a former corrections officer, Eric DeLong ("DeLong"), encountered Duncan in a bar. DeLong overheard Duncan state, "yeah, I popped that guy in the back of the head [in] California." A few days later, DeLong reported this incident to the PSP, who put him in touch with the FBI. Despite this report, DeLong "didn't hear anything for, approximately, seven years."

Approximately two and a half years after Irwin first discovered that Duncan had fled California, PA, he finally spoke to Duncan. When Irwin asked Duncan why he had left California, PA, Duncan gave his reasons, admitting to killing Newman and also to Horner's involvement. Duncan told Irwin that "Brian Horner was running [Duncan's] name about being involved in the homicide and [Horner] was actually the one that ... brought [Newman] out [of] the house and … brought him to the car. And [Duncan] was in the car and [Duncan] whacked [Newman]." Duncan went on to tell Irwin that he "whacked," or killed, Newman because he was a "snitch".

In January 2011, Duncan was arrested in Amherst, Ohio. He was interviewed again by Trooper Monkelis[,] and again made inculpatory statements. He stated that "snitches get dealt with." He stated that "he never owned or carried that caliber of a weapon."[5] After the interview, Duncan was transported back to Pennsylvania. Duncan, while en route, spoke in further detail about his views on snitches, saying that even "God doesn't like snitches."

In August of 2011, [Appellant] was housed in the Washington County Correctional Facility ("WCCF") in connection with being charged in this case. In December of 2011, [Appellant] admitted to Michael McCarthy, a fellow inmate, that he attended the 2002 meeting with Duncan and Bowman at Irwin's house. He admitted that the meeting concerned "offing[,"] or killing, Newman. McCarthy then reported the conversation to the authorities.

_____

[5] The Court notes that the caliber of the weapon was never released.

Trial Court Opinion (TCO), 3/26/13, at 2-8 (internal citations omitted).

On December 8, 2010, a grand jury issued a presentment recommending that charges be filed against Appellant, Duncan, and Irwin for their participation in a conspiracy to kill Newman (victim). On August 10, 2011, following the recommendations of the grand jury, the Commonwealth charged Appellant by criminal complaint with criminal homicide, criminal solicitation (homicide), and criminal conspiracy (homicide). The Commonwealth filed a motion to consolidate Appellant's case with Duncan's and Irwin's. The trial court granted joinder, over Appellant's objections, on October 25, 2011.

Appellant's jury trial began on January 11, 2012, and concluded on January 23, 2012. On January 24, 2012, the jury found Appellant guilty of first degree murder, criminal conspiracy (first degree murder), and criminal solicitation (first degree murder). On March 2, 2012, Appellant was sentenced to a mandatory term of life imprisonment without the possibility of parole for first degree murder, a consecutive term of 10-20 years'

incarceration for criminal solicitation, and no further penalty for his conspiracy conviction. Appellant did not file any post-sentence motions.

On March 30, 2012, Appellant filed a timely notice of appeal. By order dated April 2, 2012, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant requested, and was granted, several extensions of time while the notes of testimony were being produced. He then filed a timely Rule 1925(b) statement on September 10, 2012. The trial court issued its Rule 1925(a) opinion on March 26, 2013. Appellant now presents the following issues for our review:

> 1. Whether the testimony and evidence introduced by the Commonwealth at the time of [Appellant]'s trial was insufficient to establish [Appellant]'s guilt regarding the charges of Criminal Homicide, Murder in the First Degree, Criminal Conspiracy and Criminal Solicitation beyond a reasonable doubt[?]
>
> 2. Whether the testimony and evidence offered by the Commonwealth at the time of trial established that the [Appellant] committed a premeditated killing sufficient to justify a finding of "Guilty" of Criminal Homicide, Murder in the First Degree, Criminal Conspiracy and Criminal Solicitation[?]
>
> 3. Whether the testimony and evidence offered by the Commonwealth at the time of trial established that [Appellant] engaged in a criminal conspiracy to commit murder with the co-defendant, Michael Duncan, and whether the testimony and evidence established that [Appellant] acted as an accomplice in said murder[?]
>
> 4. Whether the testimony and evidence offered by the Commonwealth at the time of trial established that [Appellant] engaged in a criminal solicitation to commit murder with the co-defendant, Michael Duncan, or whether the testimony and evidence establish[ed] that [Appellant] acted as an accomplice in said murder[?]

- 8 -

5. Whether the Court erred/abused its discretion in granting, over [Appellant]'s objection, the Commonwealth's Motion to Consolidate for the Purpose of Trial case nos. 2217-2011 (***Commonwealth v. John Ira Bronson, Jr.***) and 357-2011 (***Commonwealth v. Michael Duncan***) where the complexity of the evidence as offered against the Defendants was likely to have caused the jury to be unable to distinguish the evidence or apply the law as to the charges separately against each Defendant[?]

6. Whether the Court erred/abused its discretion in granting, over [Appellant]'s objection, the Commonwealth's Motion to Consolidate For the Purpose of Trial case nos. 2217-2011 (***Commonwealth v. John Ira Bronson, Jr.***) and 357-2011 (***Commonwealth v. Michael Duncan***) where evidence submitted against … Michael Duncan … would not have been relevant or admissible in the trial of [Appellant], if tried alone, and where the jury was likely to consider said evidence against him even notwithstanding admonitory instructions[?]

7. Whether the Court erred/abused its discretion in granting, over [Appellant]'s objection, the Commonwealth's Motion to Consolidate For the Purpose of Trial case nos. 2217-2011 (***Commonwealth v. John Ira Bronson, Jr.***) and 357-2011 (***Commonwealth v. Michael Duncan***) where antagonistic defenses between the Defendants were present and prejudice resulted to [Appellant][?]

8. Whether the Court erred/abused its discretion in permitting the Commonwealth to call as a witness Robert Bedner, who recanted a previous out-of-court statement during [Appellant]'s preliminary hearing, for the sole purpose of impeaching Mr. Bedner with said previous out-of-court statement[?]

9. Whether the Court erred/abused its discretion in denying [Appellant]'s Petition to Compel pertaining to the victim, John Lynn Newman's, Confidential Informant (CI) File in possession of the Commonwealth, the contents of which might have affected the outcome of trial if it were shown that [Appellant] was not the only law enforcement target against whom the victim informed upon, where said

CI-target relationship was the basis for the Commonwealth's arguing motive[?] [Appellant] could not have received a fair trial without the disclosure and/or admission of said evidence.

10. Whether the Court erred / abused its discretion in refusing to render a judgment in favor of [Appellant] in the form of a dismissal of the charges against [Appellant] at the conclusion of the Commonwealth's case at the time of trial[?]

11. Whether the weight and sufficiency of the evidence was insufficient to sustain a conviction against [Appellant][?]

Appellant's Brief at 4-10.

## Weight of the Evidence

We begin by addressing Appellant's weight of the evidence claim (issue 11). A weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Pa.R.Crim.P 607. "Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion." *Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa. Super. 2012).

There is nothing in the record to indicate that Appellant properly preserved his weight of the evidence claim. The record reveals that Appellant did not file a post-sentence motion in this case, nor did he file a written motion presenting a weight claim prior to sentencing. There is also no indication that Appellant ever raised the matter orally prior to sentencing. Accordingly, Appellant's weight of the evidence claim is waived.

## Sufficiency of the Evidence

Next we address Appellant's sufficiency claims (issues 1, 2, 3, 4, 10 and 11). Appellant addresses all of these claims in his brief in a single argument section. We will address these claims collectively, as well. After stating the appropriate standards of review, Appellant's entire argument is as follows:

In the present case, the Commonwealth called more than thirty witnesses, barely a third of which offered any testimony relating to [Appellant]'s alleged involvement in a conspiracy to murder Newman. After hearing and reviewing the testimony of Trooper Borello and Attorney Comber, the Commonwealth's theory as to motive with regards to [Appellant] does not hold water. The Commonwealth would have the jury believe that [Appellant] conspired to kill Newman in order to avoid prosecution on federal drug charges, where even after Newman's death, [Appellant] still pled guilty to said charges. Similarly, the Commonwealth's theory as to the Solicitation charge regarding Bedner rested on the testimony of Bedner and Dzurco. Bedner's testimony was limited to a prior recorded audio statement made by Bedner which he plainly admitted was very possibly a lie. Dzurco's testimony with regards to his phone calls with Bedner preceding Newman's death similarly cannot be said to support any reasonable inferences as he freely admitted that he could not identify the third party he was talking to on the phone, and in any event there were no discussions of hurting or killing Newman.

The charges of Criminal Homicide, Criminal Conspiracy and Criminal Solicitation with regards to [Appellant], his co-Defendant, Michael Duncan, and Michael Bowman also cannot stand and are not based on reliable evidence and/or reasonable inferences drawn therefrom. Both Irwin and Bowman not only made several statements to police without mentioning any alleged meeting in Irwin's Daisytown home, they both made statements directly contradicting their testimony at trial. What's more, the affiant in the case, Trooper Monkelis admitted that as of November 2010, the Pennsylvania State Police could not prove to any degree of certainty that [Appellant] and his co-defendant, Michael Duncan even knew each other.

- 11 -

While the Commonwealth, as verdict winner, is entitled to all reasonable inferences drawn from said testimony, no such inferences can be drawn to sustain a conviction in the instant case. It is apparent that [Appellant]'s conviction was not a function of the jury drawing reasonable inferences from the testimony they heard.

Appellant's Brief at 22-23.

In reviewing Appellant's claims concerning the sufficiency of the evidence, we are mindful of the following standards:

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Id.* The conspiratorial agreement "can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Id.*

*Commonwealth v. Feliciano*, 67 A.3d 19, 25-26 (Pa. Super. 2013).

"A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission." 18 Pa.C.S. § 902. 'Criminal solicitation' has been described by this Court as being "an offer to enter into a conspiracy" to commit the crime solicited.

*Commonwealth v. Carey*, 439 A.2d 151, 155 (Pa. Super. 1981).

The target crime of both the conspiracy and the solicitation charges in this case is first degree murder. "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). An "intentional killing" is a killing accomplished "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d).

Appellant's sufficiency argument, reproduced above, is rife with straw men and other forms of fallacious argumentation. For instance, he asserts that "barely a third" of the thirty witnesses for the Commonwealth offered testimony linking him to a conspiracy to kill the victim. Appellant's Brief at 22. Such a statement concedes, implicitly, that *at least ten witnesses did link Appellant to the conspiracy*. Similarly, Appellant constructs a fictional motive and then strikes it down, but the motive he dismisses only vaguely resembles the motive suggested by the Commonwealth. Appellant asserts that "the Commonwealth would have the jury believe that [Appellant] conspired to kill Newman in order to avoid prosecution on federal drug charges, where even after Newman's death, the Defendant still pled guilty to said charges." *Id.* However, as the trial court notes, the victim's "betrayal [of Appellant] led to the loss of $300,000 in seized cash, the loss of [Appellant's] substantial drug business, and to [his] arrest, federal conviction, and imprisonment. Thus, [Appellant] had a strong motive to have the victim killed." TCO, at 15.

Nevertheless, none of the crimes for which Appellant was convicted required proof of motive as an element of the offense. ***See Commonwealth v. Briggs***, 12 A.3d 291, 340 n.44 (Pa. 2011) ("It is well established that the Commonwealth is not required, as a matter of law, to prove the accused's motive even where the offense charged is murder in the first degree."). Appellant's conspiracy conviction did require proof of an agreement to kill the victim, shared criminal intent to that end, and an overt act in furtherance of the conspiratorial agreement. Appellant's solicitation conviction required proof that he presented an offer to others to join such a conspiracy. As stated by the trial court, there was ample evidence proffered by the Commonwealth at trial supporting each of these elements:

> Here, several people testified that [Appellant] was actively looking for someone to kill the victim. After [Appellant]'s arrest, Duncan spoke with Irwin about another man, "Bowman, having some type of hookup where he [could] make some money . . . taking care of a snitch." Irwin witnessed a meeting between Duncan, [Appellant], and Bowman, at which [Appellant] asked Duncan to kill Newman and Duncan agreed. Bowman testified as to the meeting's purpose. The Court notes that of the four men present at the meeting, two testified as to its purpose and the two on trial denied it happened.

> However, while housed at the WCCF, [Appellant] admitted to Michael McCarthy, that he attended the above-mentioned 2002 meeting and that it concerned "offing", or killing, Newman. Duncan never explicitly stated, on the stand or in police interviews, that [Appellant] had hired him to kill the victim. However, in an interview he did state that "hypothetically" someone owed someone else a lot of money. The statement was clearly regarding the $300,000 that the victim had cost [Appellant].

> Further, Newman was murdered less than a week after [Appellant] learned that his participation with the F.B.I. as a C.I.

- 14 -

was ended and that, as a result, he would be facing his federal drug trafficking charges. [Appellant] seemed to know that the victim was responsible for his arrest, asking Trooper Borello directly if it was Newman who had informed on him. Defense counsel never satisfactorily addressed how Duncan knew that the victim was a snitch, as he so often called him.

Ultimately, [Appellant]'s motives were simple. Newman's betrayal led to the loss of $300,000 in seized cash, the loss of his substantial drug business, and to [Appellant]'s arrest, federal conviction, and imprisonment. Thus, [Appellant] had a strong motive to have the victim killed.

When viewing the facts in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense of Solicitation to Commit Murder in the First Degree beyond a reasonable doubt….

…

[Regarding his conviction for conspiracy, it was proven that Appellant] intended to aid in the commission of the crime of murder. He asked Dzurco to set up a meeting with the victim. Dzurco agreed but later changed his mind upon learning that [Appellant]'s intention was to kill Newman. In addition to Dzurco, [Appellant] also asked Bedner to assist, but he also declined.

As stated above, [Appellant] entered into an agreement with Duncan to kill Newman and Duncan agreed. This occurred in Irwin's home. Bowman, who attended the meeting, testified as to its purpose. As noted, [Appellant] admitted to Michael McCarthy that he attended the fateful meeting. He admitted that same concerned killing [the victim]. Further, Duncan made inculpatory statements as detailed above regarding the $300,000 which [the victim] had cost [Appellant]. Geletei testified to the following:

> [Duncan] come over and asked if I knew [the victim]. I said, yeah. He says, I'm going to take his ass out. And he started saying something about [Appellant] and drugs and all this. I said, I'm only in here [in jail] for child support; I don't want to get involved in this. And he kept on running his mouth saying about him being a monster and taking people out before and all this.

- 15 -

[Appellant] and his co-conspirators committed acts in furtherance of the crime of homicide. Even though Duncan actually pulled the trigger, [Appellant] entered into an agreement with him to kill [the victim] and [Appellant] attempted to find a third party to get the victim out of the house.

TCO, at 14-17.

We agree with the trial court that this evidence was sufficient to support Appellant's convictions for conspiracy and solicitation. And, although Duncan ultimately fired the fatal shot, his action was taken in furtherance of the conspiracy to which Appellant was a party. Accordingly, there was also sufficient evidence to support his conviction for first degree murder. **See Commonwealth v. Wayne**, 720 A.2d 456, 463 (Pa. 1998) ("The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy."). Accordingly, Appellant's sufficiency claims are meritless.

### **Joinder**

Next, Appellant presents several arguments supporting his claim that the trial court erred when it granted the Commonwealth's motion to consolidate his case with that of Duncan (issues 5, 6, and 7). "It is well established that the propriety of consolidating separate indictments for trial is a matter of discretion with the trial judge, and the exercise of this discretion will be reversed only for manifest abuse of discretion or prejudice and clear injustice to the defendant." **Commonwealth v. Morris**, 425 A.2d 715, 718 (Pa. 1981). "Defendants charged in separate indictments or

informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Pa.R.Crim.P 582(A)(2). "As a general policy, joint trials are encouraged when judicial economy will be promoted by avoiding the expensive and time-consuming duplication of evidence." *Commonwealth v. Jones*, 668 A.2d 491, 501 (Pa. 1995). Furthermore, where "defendants have been charged with conspiracy, joint rather than separate trials are preferred." *Id.* "However, severance may be proper where a defendant can show that he will be prejudiced by a joint trial." *Id.*

In *Commonwealth v. Lark*, 543 A.2d 491 (Pa. 1988), our Supreme Court established a three part test for determining whether joinder or severance of criminal defendants is proper. The trial court must determine

> [(1)] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [(2)] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [(3)] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Id.* at 497.

Appellant first contends that the complexity of evidence presented at trial made the danger of confusing the jury unavoidable. He claims that "the evidence offered against [Appellant] … and … Duncan … was such that the jury was likely unable to distinguish the evidence offered against Mr. Duncan from evidence offered against [Appellant]." Appellant's Brief at 25. Appellant also complains that "[w]here the vast majority of evidence offered

- 17 -

at trial applied only to one defendant, where days passed at trial where evidence was offered against only one defendant it must be said that there exists the very real potential that the jury was unable to avoid cumulating said evidence against Duncan towards [Appellant], unduly prejudicing him and denying him a fair trial." *Id.* at 25-26.

We disagree. Most, if not all, of the evidence presented against Duncan was also admissible against Appellant, due to the fact that the two were accused of a conspiracy in which Duncan killed the victim at Appellant's behest. Thus, judicial economy and the preference for joint trials in conspiracy cases are both factors that weighed strongly in favor of joinder. The trial court found that there was little risk of jury confusion in this case, despite the high volume of evidence:

> Although the testimony and evidence was extensive, it all pointed clearly towards the Commonwealth's theory of the case, which, at its heart, is quite simple. In fact, the Commonwealth's theory can be summed up in one sentence. The Commonwealth alleges that [Appellant], after having been set up by the victim who was working as a C.I., hired Duncan to kill him and Duncan did so.
>
> …
>
> It is difficult to conceive how the evidence of one man hiring another to perform murder would confuse the jury. All evidence of the solicitation was presented as to [Appellant]. All evidence of the killing was presented as to Duncan. Evidence of the conspiracy was presented as to both.

TCO, at 22-23.

We ascertain no abuse of discretion in the trial court's conclusion that there was little risk of jury confusion in this case. Accordingly, we conclude

that the trial court did not abuse its discretion in granting the Commonwealth's motion to consolidate on this basis.

Next, Appellant argues that joinder was improper because Geletei's testimony was not admissible against Appellant. Geletei testified that while he and Duncan were in prison together, Duncan came "over and asked if I knew [the victim]. I said, yeah. He says, I'm going to take his ass out. And he started saying something about [Appellant] and drugs and all this." N.T., 8/7/12, at 792. Appellant contends that this statement was not made in furtherance of the conspiracy and, therefore, although it was admissible against Duncan, it would not have been admissible against Appellant if the two were tried separately.

Appellant did not include any reference to Geletei's statement in his Rule 1925(b) concise statement. As such, the trial court did not address the admissibility of that statement. Indeed, in response to Appellant's concise statement regarding the motion to consolidate, the trial court stated that Appellant "points to no specific evidence that would have been inadmissible in a separate trial." TCO, at 24. Accordingly, Appellant has waived this argument. "Any issues not raised in a 1925(b) statement will be deemed waived." *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998).

Nevertheless, even if Appellant had not waived this claim, he has not demonstrated that its admission was *unduly* prejudicial. *See Lark*, *supra*. Appellant only states that "[t]his statement, though inadmissible had [Appellant] been tried alone, was certainly considered by the jury against

him in a joint trial with Duncan." Appellant's Brief at 27. Such argument is woefully underdeveloped and does not place Geletei's statement in the context of the record as a whole. Furthermore, Geletei's statement is wholly consistent with the bulk of evidence in this case. Both Bowman and Irwin testified "that they personally witnessed [Appellant] ask Duncan to kill the victim…." TCO, at 24. Ample evidence was produced demonstrating Appellant's motive, and evidence was introduced, through McCarthy, corroborating Appellant's participation in the conspiracy. Accordingly, even if Appellant had not waived this specific claim, he cannot demonstrate undue prejudice and, therefore, we would conclude that the trial court did not abuse its discretion in granting joinder.

Finally, Appellant contends that joinder was improper because he and Duncan presented antagonistic defenses. He claims this was demonstrated by the fact that Duncan objected to Appellant's questions during the testimony of Hull and Irwin, questions that were "designed to link Duncan to Irwin as a source of solicitation as opposed to [Appellant]…." Appellant's Brief at 27. Appellant contends this deprived him of a fair trial by requiring him to act as a "de-facto prosecutor" for Duncan while also presenting his own defense.

Again, Appellant failed to raise this claim with any specificity in his Rule 1925(b) statement, depriving the trial court of the opportunity to respond. Therefore, we deem this matter waived. ***See Lord, supra***. Nonetheless, Appellant would not be entitled to relief on this basis if we

reached the merits of the claim. "Mere fingerpointing alone-the effort to exculpate oneself by inculpating another-is insufficient to warrant a separate trial." ***Commonwealth v. Lambert***, 603 A.2d 568, 573 (Pa. 1992). To warrant a separate trial on the basis of antagonistic defenses, "[t]he evidence … must be of such a nature and quality that while it will be introduced against one defendant, it will not be admissible against others. Where the jury will infer justifiably that the conflict alone demonstrates that both are guilty, separate trials should be provided by the court." ***Id.*** Appellant's cross-examination of Hull and Irwin appears to be "mere fingerpointing" and not a matter that would necessarily cause the jury to infer guilt from the conflict. Accordingly, had Appellant not waived this claim, we would conclude that the trial court did not abuse its discretion in granting the Commonwealth's motion to consolidate on that basis.

### Testimony of Robert Bedner

Appellant also asserts that the trial court abused its discretion in permitting the Commonwealth to call Robert Bedner as a witness. Appellant argues that "[i]t is improper for the Commonwealth, with advance knowledge that a witness intends to deny the truth of an earlier out-of-court statement inculpating the defendant, to call said witness; it is reversible error for the trial court to permit the same." Appellant's Brief at 28 (citing ***Commonwealth v. Wright***, 321 A.2d 625 (Pa. 1974)). We review Appellant's claim under the following standard:

Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Cooper*, 941 A.2d 655, 667 (Pa. 2007) (citations and quotations omitted).

In *Wright*, our Supreme Court considered "whether it was reversible error to permit one of Wright's alleged confederates to take the stand as a prosecution witness when both the prosecution and the court had notice of the witness' intention to deny the truth of his earlier out-of-court statement inculpating Wright." *Wright*, 321 A.2d at 626. The *Wright* Court recognized established precedent that "it is reversible error for the prosecution, once informed of a witness' intention to claim a privilege against self-incrimination, to call that witness to the stand before the jury where the witness is likely to be thought by the jury to be associated with the defendant in the incident or transaction out of which the criminal charges arose." *Wright*, 321 A.2d at 627. Our Supreme Court found that the trial court abused its discretion in permitting the witness's testimony:

Only one legitimate purpose could have been served by the prosecutor's questions: to discover whether Hobbs would stand by his prior statement, or would renounce it. The statement itself was inadmissible against Wright, and there was no reason to bring it to the attention of the jury. Hobbs' testimony not only alerted the jurors to the existence of the statement, but also laid the basis for an inference that it was unfavorable to Wright. Once the prosecution had foreknowledge that Hobbs was likely to disavow the statement, any doubts on this score

- 22 -

should have been resolved out-side [sic] of the presence of the jury. The potential prejudice to the defendant would thus have been easily avoided.

…

Some indication of the impact of Hobbs' brief testimony disavowing the truth of his statement may be gleaned from the jury's question to the court, part-way through its deliberations, whether Hobbs' statement had been admitted in evidence, and its request to see the statement. Under these circumstances, it cannot be assumed that Hobbs' testimony did Wright no harm.

*Id.* at 626 (footnote omitted).

We disagree with Appellant's contention that the present case is analogous to **Wright**. Here, the Commonwealth sought to admit Bedner's prior statement as substantive evidence, and Bedner did not recant his prior statement or claim a privilege against self-incrimination. Bedner, when questioned about a statement he made to State Police regarding Appellant, said he could not recall what he had said, but he did indicate that his statement concerned the victim's death. N.T., 1/18/12, at 1132-33. The statement (in transcript form) was shown to him to refresh his recollection. *Id.* at 1134. It did not refresh his recollection, because, as Bedner stated, he made the statement at a time when he "did a lot of drugs" and "drugs ruled [his] life." *Id.* at 1134-35. The Commonwealth then sought to introduce a recording of the statement as a recorded recollection pursuant to Pa.R.E. 803.1(3).[2] *Id.* at 1137.

_____

[2] Rule 803.1(3) provides as exception to the rule against hearsay as follows:

*(Footnote Continued Next Page)*

- 23 -

Contrary to Appellant's argument, Bedner did not deny the truth of his prior statement; instead, he indicated that his memory of the occasion had been compromised by heavy drug use. He also testified that he "probably" told the truth when he made the statement. *Id.* at 1134. Later, during cross-examination, he admitted that he stated at Appellant's preliminary hearing that he would have "said anything to keep out of jail, a story, a lie, anything, that's highly possible what this is." *Id.* at 1166. However, at trial, Bedner stated that he "wouldn't have went out of [his] way to lie to the State Police." *Id.* He also stated at trial that it was only "possible" that he had lied to police in the recorded statement. *Id.* at 1169. Simply put, the record does not support Appellant's contention that Bedner denied the truth of his earlier statement. Furthermore, the trial court determined that Bedner "was not called solely for impeachment purposes, but rather the

*(Footnote Continued)* ───────────

**(3) Recorded Recollection of Declarant-Witness**. A memorandum or record made or adopted by a declarant-witness that:

(A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;

(B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and

(C) the declarant-witness testifies [it] accurately reflects his or her knowledge at the time when made.

Pa.R.E. 803.1(3).

- 24 -

Commonwealth anticipated that he would testify consistently with his 2003 statements." TCO, at 29. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the Commonwealth to call Bedner to testify.

### Discovery

Finally, Appellant claims the trial court abused its discretion when it denied Appellant's petition to compel the Commonwealth to produce the victim's C.I. file. The Commonwealth's theory of the case was that Appellant solicited Duncan to kill the victim because the victim's work as a C.I. had caused Appellant to be arrested and lose a significant amount of the proceeds from his drug distribution operation. Appellant contends that the contents of the C.I. file could have demonstrated the existence of others who would have had the same or similar motive to kill the victim and, therefore, the trial court abused its discretion when it denied his petition.

The trial court indicates that the file in question had been purged in 2009 pursuant to standard PSP document retention policy. Consequently, Appellant's specific claim that the trial court erred in failing to order its production is wholly frivolous because the file no longer existed at the time he requested it. Nevertheless, even if we were to construe Appellant's

assertion as a variant of a ***Brady***[3] claim, as he suggests in his brief, he would still not be entitled to relief. It is true that "the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant." ***Arizona v. Youngblood***, 488 U.S. 51, 52 (1988). However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ***Id.*** at 58.

Here, the trial court determined that Appellant could not demonstrate bad faith on the part of the Commonwealth because the court

> found by its December 27, 2011 Order that "the Commonwealth indicated that the [PSP], following standard state police practice regarding a person's confidential informant file, purged [Newman's] confidential informant file in 2009 (following a five (5) year requirement to maintain this type of file)[]." (Docket 92). As the PSP destroyed this file two years prior to the filing of charges in this case and pursuant to a standard document retention policy, the Court cannot characterize the Commonwealth's failure to preserve the evidence as being done in bad faith.

TCO, at 30.

_____

[3] ***Brady v. Maryland***, 373 U.S. 83 (1963) (holding that suppression by the prosecution of favorable evidence to an accused upon request violates due process where the evidence is material either to guilt or to punishment).

We agree with the trial court that bad faith cannot be demonstrated in these circumstances.[4] Thus, even if Appellant had properly asserted and preserved a **Brady** claim in this case, we would nonetheless conclude that the trial court did not abuse its discretion in determining that Appellant's due process rights had not been violated when the Commonwealth destroyed the victim's C.I. file.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/1/2014

---

[4] We also agree with the trial court's assessment that even if the destroyed file contained evidence of others who shared Appellant's motive to kill the victim, as Appellant claims, it is extremely unlikely that such evidence would have been materially exculpatory in and of itself. At best, it might have led an investigation towards exculpatory evidence.