J-A19008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL C. JOHNS, | |
| Appellant | No. 216 WDA 2014 |

Appeal from the Judgment of Sentence Entered August 14, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010711-2012

BEFORE:  BENDER, P.J.E., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:              **FILED AUGUST 28, 2015**

Appellant, Michael C. Johns, appeals from the judgment of sentence of an aggregate term of 36-72 months' incarceration, followed by 7 years' probation, following his conviction for crimes including official oppression, attempted insurance fraud, and drug-related offenses.  Herein, Appellant claims the trial court erred when it denied his motion to sever official oppression from the remaining charges.  He also asserts there was insufficient evidence to convict him of official oppression.  Additionally, Appellant challenges the sufficiency of the evidence supporting his drug-trafficking convictions.  After careful review, we reverse Appellant's conviction for official oppression, vacate Appellant's judgment of sentence, and remand for a new trial(s) on all offenses except official oppression.

The following summary of the facts presented at trial was set forth in Appellant's Brief:[1]

> [Appellant,] Former Pittsburgh Police Officer Michael C. Johns[,] fell in love with a heroin addicted woman, Ms. Regina Silla (Gina). Gina supported her heroin habit through prostitution; Gina ran ads in a local newspaper, Backpage, promoting her services. As police investigated the ads in Backpage, they discovered that payment for the ads came from [Appellant's] debit card. Tracing the IP address used to place the ads revealed that the ads were posted from locations around the area of [Appellant's] apartment. The ads listed contact information as either Jack C. Silla or "dborandi." Police knew David Borandi as a person who periodically drove Gina to her escort appointments, or "erotic shows" as she called them. After [Appellant] discovered that Gina used his debit card, he cancelled the card.
>
> Regina Silla first became known to police in connection with this case during a traffic stop in the early morning of April 24, 2011. William Oravetz drove a white Cadillac that police pulled over for suspicion of DUI, and Gina was his passenger. When officers noted that Oravetz did not have a valid driver's license, they asked who rented the car, Oravetz told them that Gina's friend Mike did. Silla had an Act 235 card[2] issued to [Appellant] in her purse. Gina explained that [Appellant] was her boyfriend and a Pittsburgh policeman. The officer who performed the traffic stop took Gina and Oravetz to the police station and called [Appellant], asking him if he wanted to pursue theft charges against the pair. [Appellant] did not wish to press charges. The officer, William Meisel, noticed that the Cadillac had damage to its side consistent with recently being involved in an accident. The Commonwealth offered testimony at trial, over

_____

[1] The trial court did not provide a factual summary in its Pa.R.A.P. 1925(a) opinion. However, Appellant's Brief provides an accurate summation of the evidence offered at trial, and the Commonwealth has not taken any exception to Appellant's summary. **See** Commonwealth's Brief, at 6 ("The facts and circumstances underlying the conviction have been set forth in the Brief for Appellant ….").

- 2 -

objection, that the damage to the car seemed to be from hitting a tree or a pole, and not from being sideswiped while parked on the street.

_____

[2] This card is issued to people who are eligible to perform private security work.

_____

Officer Meisel also testified that when police searched Oravetz incident to his arrest,[3] he had a shoestring in his pocket with a round key ring attached. In the key ring was a small piece of paper inscribed with the name "Alivia Kail."[4] According to Officer Meisel, Alivia Kail had been on the news at the time of the traffic stop because she was reported missing and had been presumably murdered. No connection was ever made between the Alivia Kail case and Oravetz, Gina, or [Appellant].

_____

[3] Police charged Oravetz with promoting prostitution, conspiracy, unauthorized use of a vehicle, driving with a suspended license, and traffic offenses. No information was provided at trial regarding the outcome of those charges.

[4] The transcript in this case misspells this name as "Olivia Kale[."] A search of news reports of the period indicates the proper spelling of Ms. Kail's name.

_____

Despite the lack of connection to the disappearance, Detective Daniel Mayer, the lead investigator on the Alivia Kail case, interviewed [Appellant] after the key ring's discovery. During this interview, [Appellant] discussed his relationship with Gina and admitted to Mayer that he would often rent cars and Gina would take them to use in her erotic show business. [Appellant] also told Detective Mayer that Gina would take his ID card with her when he worked. This sparked an investigation.

Detective Michael Schopp answered an ad placed by Gina. He called the number on the Backpage ad, and asked for two girls for a bachelor party. Gina and her friend Natalie arrived at the hotel escorted by William Oravetz; Oravetz went to the hotel room with the girls and asked for the promised $275.00. Schopp refused to pay Oravetz and Oravetz then returned to his car. Schopp then asked if Gina and her friend would perform

- 3 -

oral and vaginal sex for him and his partner in exchange for $600. After she agreed, police arrested Gina and charged her with prostitution and with possession of a controlled substance for heroin found in her purse. Oravetz was also arrested. Detective Schopp did not know what happened to the charges against Gina.

Detective Joseph Ryczaj testified about arranging another meeting at a Days Inn hotel via Backpage with Gina and her friend, Crystal Waz, and subsequently arresting them for prostitution and for possession of heroin. Detective Ryczaj was unable to testify as to how those charges were resolved.

On August 27, 2011, in connection with an investigation of [Appellant], Gina Silla and Crystal Waz agreed to work with narcotics Detective Todd Naylor in setting up a drug purchase. [Appellant] agreed to drive Gina and her friend to one of her erotic shows at the South Hills Hotel in the southern part of Allegheny County. [Appellant] drove a yellow cab. The girls entered the hotel room with Detective Naylor, who then prepared them with recording devices. The detective planned for the girls to ask [Appellant] to take them to see a drug dealer named "Fresh" and purchase heroin for the girls to give to "Scott[."]

[Appellant] drove the girls after being directed on how to find Fresh; Gina then left the cab and walked out of [Appellant's] sight to purchase 19 glassine bags of heroin. Gina re-entered the cab and [Appellant] took them to another hotel. When the girls arrived, Detective Naylor searched them, confiscated the heroin, and removed the recording devices. Police did not arrest Fresh in connection with this transaction. Gina and Crystal did not face charges in this incident; because of her cooperation, Gina had other charges withdrawn. During [Appellant's] trial, prosecutors played a tape recording[5] of the conversation during the car ride to and from the encounter with Fresh; Detective Naylor admitted that much of the interaction between [Appellant] and Gina involved [Appellant] attempting to persuade Gina to get off drugs, go into rehab, and turn her life around. Detective Naylor further admitted that the only connection that [Appellant] had to the drugs was that he provided transportation to Gina and Ms. Waz so they could purchase them.

———

- 4 -

[5] It is unclear why this tape was not transcribed as part of the Notes of Testimony.

___

After this controlled buy, Detective Naylor arranged to get a search warrant for [Appellant's] apartment. During the search, police discovered use paraphernalia for the heroin, small rubber bands and a quart size Ziploc bag filled with rice, as well as several random pieces of identification, including a Pennsylvania ID Card for William Jackson.

William Jackson testified at trial that [Appellant] arrested him in 2008, three years prior to [Appellant's] arrest. Jackson stated that [Appellant] took his ID card during an arrest for disorderly conduct and public drunkenness, and never returned it. Due to his lack of ID, Jackson spent the night in jail. During trial, over objection, Detective Schopp testified as an expert regarding the typical Pittsburgh police procedures followed when arresting someone for a third-degree misdemeanor. Detective Schopp stated that when the defendant in such cases has a valid ID, the police merely serve the defendant by summons or citation.

Regarding the claimed insurance fraud, the prosecution presented testimony from David Borandi, who worked as the usual driver and security man for Gina. He worked almost every night for a time, sometimes driving [Appellant's] personal car and sometimes a rental. Gina owned an uninspected, uninsured car, so it was not used. Borandi explained that he had an accident with the rental car; the car got stuck in mud and hit a tree. Borandi offered to pay to fix the car, but noted it would take him "a very long time" to get the money to fix the vehicle.

The Commonwealth played an audio tape of a conversation between an insurance adjuster for State Farm Insurance, Pete Ziff, and [Appellant]. The contents of this tape were not transcribed. State Farm did not pay to repair the rental car as [Appellant's] insurance plan did not cover cars rented for more than 30 days.

The final witness for the Commonwealth, Keith Maceil, owned an auto body business. Mr. Maceil testified that his company contracted with Enterprise Rental Car to inspect Enterprise's damaged rental cars and provide estimates for repairs. According to Maceil, the damage done to the Cadillac

indicated hitting a pole or a tree, not being sideswiped by another car while parked.

[Appellant] testified on his own behalf. [Appellant] testified that he had been a police officer for 16 years. He received unit citations and commendations during his career; he also received an award from the mayor and chief of police for meritorious service. He made thousands of arrests during the course of his career.

Gina had been [Appellant's] girlfriend up until the time of his arrest; he had no contact with her since August, 2011. [Appellant] knew that Gina would perform erotic entertainment shows for money but denied any involvement in her business. [Appellant] also denied assisting Gina in placing the ads on Backpage. [Appellant] opined that officers associated his name with the ads because Gina used his debit card, without his knowledge, to pay for them. After discovering that Gina used his card, [Appellant] cancelled that account.

[Appellant] also testified that the manager at the Enterprise car rental place gave him a reduced rate for his rental of the Cadillac. [Appellant] personally rented the car for several months in early 2011. [Appellant] eventually discovered that Gina often took his car keys and borrowed his car without his permission when he worked. [Appellant] denied knowing that Gina gave his car keys to Oravetz or Borandi so that they could drive her around. Borandi had been Gina's friend for about six years, since before [Appellant] knew her, and Borandi helped her place the ads for her business and also acted as her driver. [Appellant] also moonlighted as a yellow cab driver throughout this time. [Appellant] drove Gina around because she was his girlfriend and needed transportation; she never paid him.

[Appellant] also testified about the night of the drug "sting." [Appellant] planned to have a date with Gina that night, but Crystal Waz arrived and said that she booked an appointment to do a show for the two of them. Gina then asked [Appellant] to drive her and Crystal to the show. He agreed to drive them to the South Hills Motel. Gina and Crystal went into the hotel and [Appellant] waited for them in the cab. When they returned to the cab, Gina said that she wanted to go and see "Fresh." Gina then gave directions, which [Appellant] followed. [Appellant] denied using heroin himself, but he knew that Gina was a heavy drug addict. [Appellant] did not see, or have any

- 6 -

interaction with Fresh. [Appellant] then took Gina and Crystal to their next appointment.

Concerning the ID card for William Jackson, [Appellant] admitted he did not remember Mr. Jackson's arrest until he further investigated. The police report for Jackson's 2008 arrest states that Jackson did not have any identification with him that night; [Appellant] agreed that Jackson had none. Sometime after this arrest, [Appellant] remembered one of the security guards in the area told [Appellant] that someone had found Jackson's ID card on the ground. The guard then handed the ID card to [Appellant]. [Appellant] said that his intention was to give Jackson back his ID card at his court hearing, but he did not know why that did not happen.

Concerning the rented Cadillac, [Appellant] testified that he spoke to Todd, the Enterprise manager, after the accident and Todd told him that if the car was drivable that he could keep renting it. [Appellant] spoke with his insurance agent about coverage for the damage to the rental car. Yet, because he rented the car for more than 30 days, State Farm would not cover any damage. State Farm never made a payment to Enterprise.

[Appellant] also provided testimony at trial of two character witnesses. Mr. Jerrell Robinson, [Appellant's] former partner from the police department, testified that [Appellant] had the reputation for being a good, wholesome person. [Appellant] had compassion which sometimes other officers lacked. Brian Van Dusen also used to work with [Appellant] in a community program dealing with drug related issues. Mr. Van Dusen testified that [Appellant] is known as a "good guy" with a good reputation for being fair and operating "by the book[."] Further, [Appellant] is "an honest guy, he is fair, he is a giving guy" and "a good person to speak to."

Finally, … Gina Silla's criminal history around the time of this investigation of [Appellant] [was entered into evidence] via a stipulation …. At CC 201014123, Gina was charged with [several drug-related offenses]. On August 31, 2011, (right after the undercover action where Gina acted as a CI in this case), a magistrate dismissed these charges. At CC 201102713, the Commonwealth charged Gina with DUI[-related offenses]. On August 31, 2011, … the Commonwealth nol[le] prossed these charges. At CC 201106091, Gina was charged with [prostitution

and drug-related offenses]. On November 17, 2011, Judge Williams dismissed all charges. At case 201109861, [Gina was charged with a drug offense and motor vehicle code violations]. These charges were also nol[le] prossed and dismissed by Judge Williams on November 17, 2011. Lastly, at CC 201111082, Judge Mariani dismissed [drug-related charges] in November of 2011.

Appellant's Brief, at 10-20 (citations omitted).

On May 14, 2013, a jury convicted Appellant of the following offenses: attempted insurance fraud (18 Pa.C.S. § 4117, 18 Pa.C.S. § 901), conspiracy (delivery of heroin) (18 Pa.C.S. § 903(c)), delivery of a controlled substance (heroin) (35 P.S. § 780-113(a)(30)), possession with intent to deliver a controlled substance (heroin) (35 P.S. § 780-113(a)(30)), possession of a controlled substance (heroin) (35 P.S. § 780-113(a)(16)), obstructing administration of law or other governmental function (18 Pa.C.S. § 5101), false reports to law enforcement authorities (18 Pa.C.S. § 4906(b)(1)), and official oppression (18 Pa.C.S. § 5301).

On August 14, 2013, the trial court sentenced Appellant to a term of 3-6 years' incarceration and a consecutive term of 7 years' probation. Post-sentence motions were denied following a hearing; however, no timely appeal was filed immediately following that decision. Appellant then filed a Post Conviction Relief Act Petition seeking reinstatement of his direct appeal rights, which was granted by the court on January 8, 2014. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on April 30, 2014, as well as a supplemental Rule 1925(b) statement on July 7, 2014, following a delay

in the production of transcripts. The trial court issued its Rule 1925(a) opinion on October 10, 2014.

Appellant now presents the following questions for our review:

I. Did the trial court err in failing to grant the motion to sever charges of Official Oppression from the remaining charges, resulting in great prejudice to [Appellant]?

II. Was the evidence sufficient to support the conviction for Official Oppression?

III. Was the evidence sufficient to support the drug trafficking convictions when the charges were based solely upon the theory that [Appellant] gave a ride to his drug-addict girlfriend?

Appellant's Brief, at 7.

Appellant first challenges the denial of his pre-trial motion to sever official oppression from the remaining charges. On May 3, 2013, Appellant filed a motion to sever the charges of official oppression and a related charge of making a false statement.[2] Both charges related to Appellant's 2008 arrest of William Jackson. Appellant asserts that by prosecuting these charges along with the unrelated drug- and prostitution-related crimes, the Commonwealth "painted [Appellant] with a broad brush that screamed 'bad cop' to the jury[.]" Appellant's Brief, at 23. In this regard, Appellant argues that the trial court's refusal to grant severance unduly prejudiced him to a degree that prevented him from receiving a fair trial. We agree that the trial

_____

[2] 18 Pa.C.S. § 4904 ("Unsworn falsification to authorities"). The jury ultimately acquitted Appellant of this charge, but found him guilty of official oppression.

court erred in denying the motion to sever, and that Appellant is entitled to a new trial as a result.

Our standard of review regarding a trial court's denial of a motion to sever charges is whether the court abused its discretion. *Commonwealth v. Jones*, 610 A.2d 931, 936 (Pa. 1992). A trial court "may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583. Relatedly, offenses involving a single defendant may be tried together if: "(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (b) the offenses charged are based on the same act or transaction." Pa.R.Crim.P. 582.

Synthesizing these rules in *Commonwealth v. Lark*, 543 A.2d 491 (Pa. 1988), our Supreme Court set forth the following three-prong test for deciding a motion to sever:

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Id.* at 496–97 ("the *Lark* Test").

- 10 -

Here, the evidence supporting Appellant's conviction for official oppression included 1) the testimonial evidence of William Jackson regarding his arrest; 2) the testimonial evidence of Detective Schopp regarding typical Pittsburgh police procedures; and 3) William Jackson's Pennsylvania ID card.[3] In concluding that it did not err in refusing to grant severance, the trial court provided the following analysis in its Rule 1925(b) opinion:

> This court did not abuse its discretion in refusing to sever the 2008 charges. The evidence of [Appellant]'s possession of William Jackson's identification card, and how he came to possess have been admissible in a trial on the other charges. The ID card was found during the search of [Appellant]'s apartment. Paraphernalia for the ingestion and packaging of heroin was also found. Any evidence tending to demonstrate that a [Appellant] resided, or had control over, a residence where controlled substances or other contraband is found is relevant. The ID card of Mr. Jackson, standing alone, would not have been relevant. In fact, it could certainly have been used by the defense to argue that others had access to, or control over, the residence. The evidence explaining [Appellant]'s connection to that ID, and how it came to be in his possession, was relevant as "indicia" or proof of [Appellant]'s residency in the apartment. The evidence was also capable of being separated by the jury and was not likely to confuse them. Moreover, [Appellant] suffered no prejudice in having the cases tried together.

Trial Court Opinion (TCO), 10/9/14, at 7-8.

We begin our own analysis with an examination of the facts as they pertain to the first prong of the *Lark* Test. As is apparent from the trial court's analysis, the court did not consider whether Detective Schopp's

---

[3] Where applicable, these three items are collectively referred to as the "evidence of official oppression."

testimony would have been admissible in a separate trial for the drug-related offenses for which Appellant was convicted. The court only considered the admissibility of Jackson's testimony and his ID card at a separate trial for Appellant's drug-related offenses. Additionally, the trial court does not at all discuss how the evidence of official oppression was admissible in a separate trial for attempted insurance fraud. After our own careful consideration of the record, we conclude that evidence of Detective Schopp's testimony regarding Pittsburgh police policy would not be relevant in separate trials for Appellant's drug-related offenses or insurance fraud, and none of the evidence of official oppression would be admissible in a separate trial for attempted insurance fraud.

Moreover, the trial court only conducted a one-directional analysis. The trial court did not consider whether any of the drug-related evidence, or evidence of attempted insurance fraud, would be admissible for any purpose in a separate trial for official oppression. It is immediately apparent that such evidence would not be admissible in a separate trial for official oppression. Even though Jackson's ID card was discovered in a search conducted pursuant to an investigation into Appellant's drug-related charges, the drug-related evidence was not relevant to any issue that could arise during a separate trial for official oppression.

Appellant's drug-related crimes and official oppression offense also did not, in any sense, constitute a single criminal episode.[4] In determining whether offenses constitute a single criminal episode, courts consider: "(1) the temporal sequence of events; (2) the logical relationship between the acts; and (3) whether they share common issues of law and fact." *Lane*, 658 A.2d at 1355. Here, the offense of official oppression arose out of Appellant's arrest of Jackson in 2008, whereas Appellant's drug-related offenses pertain to events occurring in 2011. There is no logical relationship between these criminal acts. The only nexus of facts between the offenses is trivial, as the discovery of Jackson's ID occurred during a search of Appellant's home in 2011. No common issues of law are present. Accordingly, these separate offenses did not arise out of a single criminal episode.

The Commonwealth concedes that the joined offenses did not arise out of the same criminal episode. Commonwealth's Brief, at 15 ("These charges did not arise from the same act or transaction as others in the

---

[4] Evidence of one crime that might otherwise be inadmissible in a separate trial for another crime may be admissible in a joint trial for both offenses if both offenses arise from a single criminal episode. *Commonwealth v. Lane*, 658 A.2d 1353, 1355 (Pa. Super. 1995). This is to prevent harassment by the prosecution in the form of successive prosecutions for offenses that arise out of a single criminal episode even though they involve distinct facts. *See* 18 Pa.C.S. § 110(1)(ii) (barring a new prosecution for "any offense based on the same conduct or arising from the same criminal episode" that formed the basis of a former prosecution that resulted in conviction or acquittal).

Information."). The Commonwealth contends, however, that Jackson's ID card and testimony related to Jackson's arrest was admissible at separate trials. However, much like the trial court, the Commonwealth simply overlooks the admissibility of the significant amount of drug-related evidence and testimony in a separate trial for official oppression, and then analyzes jury confusion and prejudice issues premised exclusively on Jackson's testimonial evidence and physical evidence, his ID, under the second and third prongs of the *Lark* Test. Yet, having determined that much of the evidence of Appellant's drug-related offenses was inadmissible in a separate trial for official oppression, we do not even reach beyond the first prong of the *Lark* Test.

Accordingly, we conclude that the trial court erred in denying Appellant's pre-trial motion to sever official oppression from the remaining charges as it is clear that the first prong of *Lark* could not be satisfied in this case. As such, we are compelled to reverse Appellant's judgment of sentence and remand for new, separate trials.

Despite reaching this disposition, we are still obligated to address Appellant's remaining sufficiency claims. Our standard of review of sufficiency claims is well-settled:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence

is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

Appellant's first sufficiency challenge concerns the evidence supporting his conviction for official oppression. Essentially, Appellant argues that there was insufficient evidence for that offense because he lawfully arrested Jackson, regardless of his compliance with police policy that would have permitted him to merely issue a citation for charged offenses. We agree.

Official oppression is defined as follows:

A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:

(1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or

(2) denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.

18 Pa.C.S. § 5301.

Jackson entered a guilty plea to disorderly conduct and public intoxication, the charges for which he was arrested by Appellant in 2008. N.T., 5/7/2013 - 5/14/2013, at 162-63; 167-68. Although both crimes were graded as summary offenses for purposes of Jackson's plea, disorderly

conduct may be graded as "a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist." 18 Pa.C.S. § 5503(b). A police officer may make a warrantless arrest for a misdemeanor if he has probable cause to believe that the offense is being committed in his presence. *Commonwealth v. Reeves*, 297 A.2d 142, 143 (Pa. Super. 1972).

In finding the evidence sufficient to support the jury's verdict on official oppression, the trial court does not discuss the legality of Jackson's arrest. Instead, the trial court states that the jury could have found all the elements of official oppression were met if the jury believed that Appellant "lied in the police report and affidavit of probable cause and, thereby, caused Mr. Jackson to be arrested and jailed." TCO, at 14. In its brief, the Commonwealth agrees that this was the theory of guilt pursued by the prosecution at Appellant's trial:

> The Commonwealth's position at trial was that because an individual with an identification card normally would not be taken to jail for the offenses of public intoxication and disorderly conduct (those charged against Jackson) if he had a valid identification card, [A]ppellant's action in taking Jackson's ID card caused Jackson to be jailed.

Commonwealth's Brief, at 20 (emphasis in original).

Consistent with our standard of review, this Court must resolve any credibility issues in favor of the Commonwealth's theory of guilt. Thus, we assume for purposes of our sufficiency analysis that Appellant did not

inadvertently come into possession of Jackson's ID card as Appellant claimed during his trial. Rather, we must assume that Appellant intentionally took possession of Jackson's ID during the arrest and then failed to subsequently return it to him.

The Commonwealth does not appear to dispute that Jackson committed an arrestable offense, but still maintains that the arrest itself was the harm inflicted by Appellant's conduct. Thus, the Commonwealth's theory of guilt hinges on the likelihood of Jackson's incarceration in the absence of Appellant's bad conduct, rather than on the legality of the arrest itself. If, however, Jackson could have been arrested regardless of whether he possessed his ID card, then it strains logic to conclude that Appellant's bad conduct *caused* Jackson's arrest/incarceration.

Neither the Commonwealth nor the trial court provides any case law supporting the theory of guilt for which Appellant was convicted of official oppression. Indeed, the Commonwealth acknowledges that some support *for Appellant's claim* may be found in **Commonwealth v. Baranyai**, 419 A.2d 1368 (Pa. Super. 1980). Baranyai, a police officer, was convicted of official oppression based on circumstances surrounding his arrest of David Stier for DUI and resisting arrest, which included Baranyai's arguably excessive use of force to overcome Stier's purported resistance to arrest. Stier accepted Accelerated Rehabilitative Disposition (ARD) with regard to DUI and resisting arrest. In light of that disposition, Baranyai argued on appeal that his conviction for official oppression was barred by collateral

estoppel, contending that Stier's acceptance of ARD effectively demonstrated the legality of the arrest. The Superior Court rejected Baranyai's argument because Stier's acceptance of ARD "did not constitute an adjudication of guilt" and because "the Commonwealth and not [Baranyai] was the other party in that criminal action." *Baranyai*, 419 A.2d at 1373.

Here, the Commonwealth notes that because the *Baranyai* Court dismissed Baranyai's collateral estoppel claim on two separate grounds, it is unclear whether it would have ruled differently if Stier had pled guilty, as Jackson did in this case. In our own analysis, *Baranyai* is also distinguishable because Baranyai violently assaulted Stier while arresting him for DUI, a fact that was pertinent to both Stier's resisting arrest charge and Baranyai's official oppression charge. Here, however, Appellant's purported theft of Jackson's ID did not directly or indirectly impact the elements of the crimes for which Jackson was charged, arrested, and to which he ultimately pled guilty. In light of these differences, *Baranyai* could certainly be read as persuasive support of Appellant's argument; but, ultimately, the *Baranyai* decision was too light on analysis of the collateral estoppel claim to be controlling in this matter.

Both parties also discuss *Commonwealth v. Eisemann*, 453 A.2d 1045 (Pa. Super. 1982), but arrive at opposite conclusions as to

*Eisemann*'s import. The facts in *Eisemann* are not at all analogous to the instant matter.[5] However, in that case, this Court articulated that,

> in order to constitute the offense of "Official Oppression[,"] the person acting in the "official capacity" must *knowingly* and *illegally* deny or impede another in the exercise of some "right[,"] "power" or "immunity[,"] or must knowingly and illegally subject another to "arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights[."] [Emphasis—ours.][6] We hold that the word "knowing" means that the accused must have been acting in "bad faith" when he subjected the other to the proscribed activities.

*Id.* at 1048.

The Commonwealth asserts that Appellant's theft of Jackson's ID constitutes 'bad faith' because, as a 16-year veteran of the Pittsburgh Police force, he would have known that Jackson was *likely* to have been treated differently had Appellant not deprived him of his ID. Appellant argues, however, that irrespective of his apparent 'bad faith', Jackson had neither a privilege nor a right to not be arrested for an arrestable offense, nor did he have any cognizable immunity from arrest. The Commonwealth appears to concede this point, admitting that "Jackson had no 'right' not to answer to the criminal justice system for criminal behavior[.]" Commonwealth's Brief,

---

[5] Eisemann was "a private prosecutor who want[ed] to charge the mayor and four council members of the City of Lock Haven, Pennsylvania, with" official oppression for refusing to answer his questions at a public meeting. *Id.* at 1046. Eisemann asserted that any attempt to limit his speech at the meeting constituted official oppression.

[6] Bracketed comment in original.

at 22. Instead, the Commonwealth contends, "what [Jackson] could be said to have had was an expectation, supported by police practice, that by providing proper identification, he would not be taken to jail." *Id.*

When reviewing the scope of the official oppression statute, we must adhere to the following principles:

> [P]enal statutes are to be strictly construed. The need for strict construction does not require that the words of a penal statute be given their narrowest possible meaning or that legislative intent be disregarded, nor does it override the more general principle that the words of a statute must be construed according to their common and approved usage[.] It does mean, however, that where ambiguity exists in the language of a penal statute, such language should be interpreted in the light most favorable to the accused. More specifically, where doubt exists concerning the proper scope of a penal statute, it is the accused who should receive the benefit of such doubt. Significantly, a court may not achieve an acceptable construction of a penal statute by reading into the statute terms that broaden its scope.

*Commonwealth v. Booth*, 766 A.2d 843, 846 (Pa. 2001) (internal citations omitted).

In our view, the plain meaning of Section 5301 does not aim to criminalize the denial or impediment of mere expectations, even where such expectations arise out of long-standing police policies or practices. And, even if the statute could be interpreted to protect such expectations in defiance of its plain meaning and the principle of lenity, there is no evidence of record that Jackson actually held such an expectation. Moreover, as discussed above, Jackson was lawfully arrested, and could have been lawfully arrested even if Appellant had not taken his ID card. Accordingly,

we conclude that there was insufficient evidence to support Appellant's conviction for official oppression.

Before we address Appellant's second sufficiency claim, which concerns his drug-trafficking convictions, we must first address whether he has waived a challenge to the sufficiency of the evidence supporting his conviction for conspiracy to commit those offenses. The Commonwealth contends Appellant waived any sufficiency challenge to that offense by failing to raise the matter in his Rule 1925(b) statement, a position taken by the trial court in its Rule 1925(a) opinion. ***See Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."). Appellant pleads that we entertain this issue on appeal because if prior appellate counsel had in fact waived a challenge to the sufficiency of his conspiracy conviction, prior counsel's failure would constitute a clear case of record-based ineffective assistance of counsel. However, because we conclude that Appellant's Rule 1925(b) adequately, if inartfully, preserved the challenge to his conspiracy conviction, we conclude that Appellant did not waive the claim.

We must acknowledge that Appellant did not clearly and unambiguously set forth a separate and distinct claim challenging the sufficiency of the evidence supporting his conspiracy conviction in his Rule 1925(b) statement. However, Appellant's sufficiency challenge to his drug-trafficking convictions was raised as follows:

**Insufficient Evidence: Delivery of [a Controlled Substance]** Appellant's state and federal due process rights, *see* U.S. Const. amend. XIV and Pa. Const. art. I § 9, were violated when he was convicted of Delivery of a Controlled Substance (35 P.S. § 780-113(a)(30)) on or about August 27, 2011. Acquittal on the charge of Possession of a Controlled Substance with Intent to Deliver ought to have been voted by Appellant's jury since the Commonwealth failed to prove, beyond a reasonable doubt, either (a) that Appellant, or a person for whose conduct Appellant was legally responsible, possessed the controlled substance of heroin on August 27, 2011, or (b) that Appellant, or a person for whose conduct Appellant was legally responsible, delivered to another person the possessed [controlled substance] on August 27, 2011 by either Appellant or a person for whose conduct Appellant was legally responsible.

Appellant's Pa.R.A.P. 1925(b) Statement, 4/30/14, at 4-5 ¶ 7.

The Commonwealth never asserted at trial that Appellant acted as a principle in the commission of the drug-trafficking offense for which he was convicted. Accordingly, the only theories of his guilt pursued concerned Appellant's role as an accomplice or a co-conspirator to drug-trafficking for his assisting of Gina in her endeavor to acquire heroin from "Fresh" on behalf of Detective Naylor. While inartfully drafted, Appellant's delivery-of-a-controlled-substance sufficiency claim does raise the matter of his culpability as a co-conspirator or accomplice by repeatedly referencing "or a person for whose conduct Appellant was legally responsible." ***Id.*** No other basis for the inclusion of that repeated phrase is possible. Therefore, when read in the context of the instant case, Appellant's above-quoted statement of the issue does not appear to abandon a challenge to his conspiracy conviction as found by the trial court and argued by the Commonwealth.

Indeed, given the factual and procedural posture of this case, a challenge to the sufficiency of the drug-trafficking conviction would be meaningless in the absence of a challenge to the related conspiracy conviction. Accordingly, to apply *Lord*'s waiver in this instance would be excessively harsh and unjust, as Appellant clearly made some attempt to preserve a conspiracy-based sufficiency challenge to his drug-trafficking convictions. Thus, we hold that Appellant did not waive consideration of the sufficiency of the evidence supporting his conviction for conspiracy.

Regardless of this waiver issue, however, Appellant's sufficiency challenge to his drug-trafficking-related convictions is meritless. It is axiomatic that "conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy." *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (*en banc*).

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; …

18 Pa.C.S. § 903(a). In addition to the conspiratorial agreement, "[n]o person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired." 18 Pa.C.S. § 903.

> The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is

- 23 -

insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.*, that [he] was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

A conspiracy is almost always proved through circumstantial evidence. "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." The evidence must, however, "rise above mere suspicion or possibility of guilty collusion."

**Lambert**, 795 A.2d at 1016 (citations omitted).

To distinguish between an actual conspiracy and 'mere suspicion or possibility of guilty collusion,' this Court considers the following factors:

(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

**Id.**

In the instant case, and in reference to the above-listed factors, we surmise the following: (1) Appellant's prior association with Gina is undisputed. (2) Appellant knew that Gina used heroin, and that the purpose of their trip to see "Fresh" was for Gina to procure heroin, and then Appellant would return Gina to the hotel with the contraband for use by her and "Scott," the cover name for Detective Naylor. (3) While Appellant was not present when Gina acquired the heroin from "Fresh" or delivered it to "Scott," he was certainly present during the transportation of the narcotics.

(4) Appellant can also be said to have participated in the object of the conspiracy, which was the purchase, transport, and delivery of heroin. Appellant participated in all three aspects of that objective by providing transportation to Gina with full knowledge that he was doing so in order to facilitate Gina's purchase and delivery of heroin. Finally, Gina undertook overt acts in furtherance of the conspiracy by purchasing and delivering the heroin, and Appellant committed an overt act in furtherance of the conspiracy by providing her transportation for those activities with full knowledge of what was occurring. Thus, the evidence was sufficient to support Appellant's conviction for conspiracy. Consequently, the evidence was sufficient to support Appellant's drug-trafficking convictions as well.

For the same reasons, Appellant was also culpable as an accomplice. "A person is an accomplice of another person in the commission of an offense if: (1) with the intent of promoting or facilitating the commission of the offense, he: … (ii) aids or agrees or attempts to aid such other person in planning or committing it …." 18 Pa.C.S. § 306(c). As discussed above, Appellant aided Gina in her commission of drug-trafficking offenses.

Appellant argues that he was "merely a driver for his girlfriend[,]" and that she "made all decisions and handled all transactions." Appellant's Brief, at 52. However, Appellant admitted his knowledge of Gina's criminal enterprise, and facilitated it by providing her transportation. That Appellant was not an equal partner in that enterprise does not relieve him of culpability. There was a common understanding that drug-trafficking

offenses would be committed, and overt acts were taken by both Gina and Appellant in furtherance of that tacit conspiratorial agreement. Appellant was not merely present during those offenses, nor was he merely knowledgeable that they would occur.

In summary, we conclude that the trial court erred when it denied Appellant's pre-trial motion to sever official oppression from the remaining charges. As such, we vacate Appellant's judgment of sentence and remand for a new trial(s). However, because we conclude that there was insufficient evidence of official oppression, Appellant cannot be retried for that offense. *See Commonwealth v. McMullen*, 721 A.2d 370, 374 (Pa. Super. 1998) (recognizing that "the double jeopardy clause will bar retrial when a conviction is reversed 'because of insufficiency of the evidence'"). We also conclude that there was no merit to Appellant's challenge to the sufficiency of the evidence supporting his drug-trafficking and conspiracy offenses; thus, Appellant may be retried for those offenses.

Conviction for official oppression *reversed*. Judgment of sentence *vacated*. Case *remanded* for a new trial(s), consistent with the holdings in this memorandum. Jurisdiction *relinquished*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/28/2015</u>